444 So.2d 803 (1983)
RESERVE LIFE INSURANCE CO., et al.
v.
Henry McGEE.
No. 53825.
Supreme Court of Mississippi.
December 14, 1983.
Rehearing Denied January 25, 1984.
*804 Arthur F. Jernigan, Jr., James H. Gabriel, Bacon, Jernigan & Martin, Jackson, for appellants.
James W. Nobles, Jr., Jackson, J. Hal Ross, Brandon, for appellee.
Before the court en banc.
BOWLING, Justice, for the Court:
The primary question involved in this appeal from the Circuit Court of Rankin County is whether or not appellee's evidence was sufficient to make a jury question on liability of appellant, Reserve Life Insurance Company, for punitive damages for failure to pay appellee's claim for medical and hospital benefits under the policy of insurance issued to appellee. Appellee received a jury verdict of $2,416 as actual expenses owed under the policy and a verdict of $158,000 as punitive damages. As is often the case, the Court is required to apply applicable legal principles to the particular facts of a particular case. As usual, those facts are different from any other case previously considered.
Mr. and Mrs. Henry McGee resided in Rankin County, Mississippi. For approximately five years Mrs. McGee had a policy of what is commonly known as "hospitalization insurance" with appellant, Reserve Life Insurance Company. Mr. McGee had his insurance with Blue Cross-Blue Shield Company. This policy with Blue Cross-Blue Shield was approaching the renewal date and Mr. and Mrs. McGee discussed the fact that Mr. McGee's policy did not provide for adequate room charge payments and, for this reason, the Jackson office of appellant [hereinafter referred to as Reserve] was requested to have someone contact them about insuring McGee with that company.
On the night of February 18, 1980, Mr. Bill Nunn came to the McGee home for the purpose of discussing Mr. McGee's insurance and a possible application to Reserve. Mr. Nunn was the agency director for Reserve and also actively solicited and secured applications for policies. The main conflict in the evidence, which is important in the disposition of the cause, was the testimony of Mr. and Mrs. McGee and that of Nunn regarding the completion of the application for insurance. A copy of this application is attached hereto as Appendix "A". There are seven questions on the application. Four of these have sub-questions. After each question and sub-question there were two blocks, one under "yes" and one under "no." All of these questions refer to the physical conditions of the applicant Mr. McGee and most of them list specific medical conditions, requesting whether or not the applicant was suffering from any of those physical infirmities. Mr. McGee, who has a third grade education, testified positively that Nunn did not read each question to him, but asked in general terms regarding Mr. McGee's health. McGee testified that he told Nunn that he was in "good" health. McGee testified that as shown under question 10(b) of the application, Nunn was told that McGee's physician was Dr. Bobo of Pearl and that Nunn could secure any information needed from Dr. Bobo pertaining to McGee. Nunn was advised that McGee had not been confined to a hospital in the past five years, but had been seen by Dr. Bobo. At Nunn's request, McGee executed a written authority for the appellant company to contact Dr. Bobo and secure any medical information from him regarding McGee's prior record before the policy was issued. It was the McGees' understanding that this would be done. Their sworn testimony was that Nunn told them it would be done. It is noted, as shown on the attached copy of the application, that Nunn in the blanks at the bottom of the application under the response to question 10(b) wrote "complete physical by Dr. Bobo." In the next blank Nunn wrote "ex. health." We digress here and state that Nunn in his *805 testimony agreed that McGee stated he was in "good health" and Nunn was the one who wrote "excellent health."
Appellee and his wife gave Nunn a check for the first month's premium. Nunn's testimony was that for the first year a policy is in force, he receives something around fifty percent of the premiums and thereafter a lesser percentage during the life of the policy. McGee executed a form that gave appellant company authority to draw a draft on the McGee account each month for the monthly premiums.
The appellant company issued Mr. McGee the policy of insurance dated March 16, 1980, approximately a month after the application was secured, but in time for the Blue Cross-Blue Shield policy to be cancelled.
In September 1980 appellant McGee began having some trouble with his urinary tract. He conferred with Dr. Bobo, who referred him to Dr. Charles Jackson, a specialist in Jackson. Jackson examined McGee and found a lesion on his bladder. McGee was admitted to the St. Dominic's Hospital in Jackson on September 16, 1980, and by using special instruments, the lesion was removed. An examination determined that the lesion was a transitional cell carcenoma of a low grade and short prior existence. Appellee was in the hospital nine days and was discharged with a good prognosis. After discharge, the proper forms were completed for benefits under the policy discussed above and the forms forwarded to appellant company. McGee heard from appellant company by receiving a form dated December 3, 1980, in which the company representative stated that they needed more information and "we will appreciate your courtesy while your file is being completed."
On December 14, 1980, McGee again was hospitalized by Dr. Jackson for a period of five days. He had noted some irregularity in the bladder that was suspicious and wanted to check this situation. As a result of that hospitalization, Dr. Jackson was of the opinion that the trouble was inflammatory and there was no evidence of residual tumor. He was treated and at the time of the trial on November 4, 1981, there had been no further evidence of bladder tumor regarding Mr. McGee. According to Dr. Jackson, there was no connection between McGee's bladder problem and any transient ischemic attack he might have had in the past.
By letter dated January 12, 1981, McGee was informed by appellant company that their file still was incomplete with respect to the September 16, 1980, hospitalization and that their representative was still investigating his medical history. This letter ended with "Thank you again for your continued patience and cooperation." Understandably, Mr. McGee's patience by that time was somewhat tested. He, therefore, employed an attorney to represent him in his claim for hospitalization benefits. This culminated in a letter dated February 12, 1981, to McGee's attorney advising:
We have learned of ten separate dates of office visits to Dr. Bobo during 1977, 1978 and 1979, some of which were for treatment of a condition which would have been pertinent to our acceptance of Mr. McGee for coverage with this Company.
Had the Company known of Mr. McGee's history of transient ischemic attack, which dates back to at least June 1978, coverage would not have been issued to him. The initial premium submitted with the application would have been returned along with a letter of explanation.
Although we have only recently learned of this history, our obligation remains the same as it was initially, and is limited to a refund of premiums paid to date. The policy should be attached to the enclosed draft before taking the draft to the bank for payment.
The check included payments for five months' premiums that the company had been issuing a draft for and collecting thereon during the time of their "investigation." The evidence revealed that during that period of time, appellant company had employed a large investigation firm named *806 Equifax Services to investigate McGee's medical history. In addition to that of McGee's personal physician for five years prior to the application, as hereinbefore discussed, the Equifax investigation was directed to hospitals and doctors, including a Dr. Lee of Forest and local hospitals. No hospitalization was found in this extensive investigation. It was ascertained that there were two Dr. Lees in Forest, Mississippi. According to Equifax Services, "A thorough search of Dr. John Paul Lee's records" was made and no record was found on a Henry McGee. A search of the records of Dr. Charles David Lee revealed that he had seen a Henry McGee four times: October 13, 1959; April 5, 1965; November 15, 1965; and December 15, 1966. All four of these visits during the seven year period were for such things as bronchitis. The last visit in December of 1966 was for treatment of a cough.
Introduced in evidence was a memo dated February 3, 1981, from a Mr. Rowland [a witness at the trial] to the underwriting manager relating that he would have declined the original application and gave as a reason under the heading "claim history developed" the following: "History of TIA with office visits, June 16, 1978, and July 2, 1979, as well as checks and prescriptions."
We, therefore, find that after giving up on the wide-spread investigation of McGee, appellant relied solely on the record of Dr. Bobo of Pearl, whose name McGee had given Nunn the night the original application was taken and when McGee signed the authority at the request of Mr. Nunn for Dr. Bobo to give any information to appellant company prior to the issuance of the policy. This record of Dr. Bobo is as follows:

 2-13-76 infection behind left ear
 2-7-77 flu syndrome
 2-10-77 re-check
 2-14-77 re-check
 6-16-78 tia
 6-20-78 re-check
 6-19-78 headache and bronchitis
 12-13-78 contusion of nose
 12-19-78 flu syndrome
 6-2-79 headache and tia
 7-11-79 re-check
 5-2-80 bronchitis
 12-19-80 flu syndrome

For the two TIA diagnoses, Dr. Bobo prescribed nicotonic acid, the same medication used to treat inner ear trouble that causes dizziness.
Referring to the pleadings, the declaration was filed on April 1, 1981, with allegations in detail as to Nunn's visit to secure the application and in much other detail, including refusal of appellant company to pay the claim. The declaration included a request for punitive damages against Reserve. There were general denials by Reserve of most of the declaration's paragraphs. After this we find "first affirmative defense" which reads as follows:
That Henry McGee, Plaintiff, made false statements on his application for insurance with Reserve Life Insurance Company which materially affected either the acceptance of the risk or the hazard assumed by Reserve Life Insurance Company, all according to Section 83-9-11(3), Mississippi Code of 1972, Annotated.
That accordingly, due to the material misrepresentations and false statements of the insured, Henry McGee, policy number 0590994A was rescinded by the company on February 12, 1981, after the company learned of said false statements and material misrepresentations and the insured was refunded the premiums previously paid to said Defendants.
Interrogatory 3 propounded by plaintiff to appellee company is as follows:
3. In the answer filed in this cause on behalf of the defendants, Reserve Life Insurance Company and Bill Nunn, it is alleged that Henry McGee, the plaintiff, made false statements on his application for insurance which materially affected either the acceptance of the risk or the hazard assumed by Reserve Life Insurance Company according to Section 83-9-11(3) of the Mississippi Code of 1972, as annotated. With regard to said allegations, please state the following: Exactly which statements were made by Henry *807 McGee; the exact wording of such statements; to whom said statements were made; on what date; in what way they were false; in what way they materially affected the acceptance of the risk; in what way they materially affected the hazard assumed by Reserve Life Insurance Company.
The appellant's answer to Interrogatory No. 3 is as follows:
Plaintiff failed to truthfully answer question 10(b) of the application for insurance in that he failed to disclose that from the period of February 13, 1976, until July 16, 1979, that he had eleven office visits for various illnesses to Dr. Edgar E. Bobo in Pearl, Mississippi; his answer to that particular question was made to William A. Nunn; February 18, 1980; plaintiff failed to disclose the complete nature of his medical history; plaintiff failed to disclose that he had been diagnosed and treated in June 1978 for transient ischemia attack (TIA) and that had this information been disclosed on the application, defendant Reserve Life Insurance Company would have declined to issue the policy. In addition, due to the several episodes of bronchitis, the policy would have required a waiver eliminating liability for bronchitis even if the TIA had not existed. William A. Nunn lives at Morningside Apartments, F-16, Jackson, MS 39202.
Appellant in its brief stated that "The appellant relied upon the above referenced section [83-9-11(3)] as an affirmative defense to the declaration filed by Mr. McGee." Appellee replied, denying the affirmative defense, thereby requiring appellant to prove its affirmative defense. Reserve Life Ins. Co. v. Brunson, 252 Miss. 20, 172 So.2d 571 (Miss. 1965).
There is no question regarding whether or not appellee's claims were owed under the terms of the policy. They clearly and undisputedly were covered. Also, the testimony was undisputed that the September and December 1980 hospitalization had nothing whatever to do with the alleged transient ischemia attack or bronchitis attack set up in the affirmative defense.
It was admitted by agent Nunn that when McGee told him he was in good health, then, he (Nunn), of his own volition substituted "excellent" for "good."
The only request of appellant for a directed verdict at the conclusion of all the evidence was a request in the form of a proposed written instruction from the Court "that it is your sworn duty to return a verdict for the defendant."
We should say here that during the entire five months appellant was "investigating" the alleged false answer on McGee's application, the appellant nor its hired representatives contacted Mr. Nunn about what he put on the application and why. He first learned of the facts of the policy cancellation when the company secured a refund of his part of the premiums the company had collected during the five month investigatory period. This is especially important when considering the undisputed proof that at no time did either Dr. Bobo, Mr. Nunn or anyone else ever mention to appellee the term "transient ischemia attack". We have already seen that both Mr. and Mrs. McGee testified positively that according to Mr. Nunn the company was going to contact Dr. Bobo prior to issuing the policy. The jury had a right to believe Mr. and Mrs. McGee's testimony.
There has been a lot written by various members of the judiciary and legal article writers about "bad faith" cases. It is unknown to us how this term "bad faith" came into being. These words were never mentioned in the principal case from this Court of Standard Life of Indiana v. Veal, 354 So.2d 239 (Miss. 1977). Some would have us put this term in a straight jacket which no other court has done; this for the obvious reason that in litigation of cases, it is usually hard to make a legal principle all black or all white. Some of them are gray. Before ending this opinion, we shall discuss this situation further.
*808 This is purely and simply a case where the plaintiff was forced to litigate under the previous edicts of this Court regarding liability of an insurance company under a hospitalization policy and regarding if and when the company refusing payment would be subject to an assessment of punitive damages by a jury  nothing more and nothing less. The rules in this game clearly have been set forth by the prior decisions of this Court.
Appellee filed his suit contending that his claim clearly was covered under the terms of the policy [undisputed] and that the company had refused to pay, saying it had cancelled the policy ab initio. The appellant insurance company filed its answer saying that as an affirmative defense they hereby invoke the last sentence of M.C.A. § 83-9-11 (1972), and contend that a false statement on the application gives it a right to cancel the policy as the statement materially affected the acceptance of the risk, even though the claim was clearly covered under the terms of the policy. The case was litigated in the lower court on this basis and there is no need to rehash the evidence hereinbefore set out. Also, the trial court was of the opinion that a jury question existed as to whether or not appellant should prevail under its affirmative defenses and further that the evidence of appellee was sufficient to bring the case within the opinion in Veal, supra, and was sufficient to submit the question of punitive damages to the jury.
The instructions given the jury at the request of parties clearly followed the outline set out in Veal, supra. There we said:
This case demonstrates the necesisty of awarding punitive damages when an insurance company refuses to pay a legitimate claim, and bases its refusal to honor the claim on a reason clearly contrary to the express provisions of its own policy. If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely.
(354 So.2d at 248).
We also stated in Veal that punitive damages are assessed as an example and warning to others and should be allowed only with caution and within limitation. In Veal we quoted from Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), by saying:
Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory settlement They are granted in the nature of punishment for wrongdoing of the defendant and as an example so others may be deterred from the commission of similar offenses thereby in theory protecting the public. [citations omitted]... . .
In Seals v. St. Regis Paper Co., 236 So.2d 388, (Miss. 1970), the Court ... stated: Punitive damages may be recovered for a wilful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong... . [W]e stated in Progressive Casualty Insurance Company v. Keys, 317 So.2d 396 (Miss. 1975); (b) punitive damages are not recoverable for the breach of a contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort. (citations omitted).
(354 So.2d at 247).
Now we come to the part of Veal that seems to make everyone want to write articles and request clarification, which, in our opinion, already is perfectly clear. We shall attempt to word it so that all can understand its terms. This is in regard to the paragraph in the opinion which says:
Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the *809 claim filed with it. We therefore hold that punitive damages are allowable.
(354 So.2d at 248).
The difficulty seems to be in determining who makes the decision whether or not the insurance company has a "legitimate reason" or an "arguable reason" for failure to pay the claim. It should be clear that the rules governing this decision are the same in this case, in Veal, and in all other cases. We stop to say here that in the vast majority of so-called "bad faith" claims for failure to pay, we have held that the company had a legitimate or arguable reason. In only two or three cases have we held that this was a fact for the determination of the jury under a certain set of facts, with proper instructions.
We have already seen that in the present case the trial court was not asked to hold as a matter of law that appellant had a legitimate or arguable reason for denial. He was merely asked in the form of a proposed written instruction that the jury find for appellant. Furthermore, the instructions submitted the issue properly to the jury, under the evidence shown in the record. Appellant requested and received an instruction among other similar instructions that said to the jury:
Punitive damages may be awarded only if you find that the action complained of is of a wanton, malicious or fraudulent nature, or if the injury inflicted was committed by gross negligence indicative of a wanton and wilful disregard of the rights of others. But if the defendant has presented any legitimate, allowable, or arguable reason for voiding the coverage of the policy, there can be no award of punitive damages.
We are discussing this issue of punitive damages here as this issue is tied with the initial liability question; that is, whether or not the company cancelled the policy ab initio under the evidence hereinbefore discussed because it had a legitimate or arguable reason so to do.
We state here that there was a clear question for the jury to determine whether or not appellee made false statements on his application that would permit appellant to cancel the policy months later, after claim made, under Section 83-9-11(3). A failure to have submitted this question to the jury clearly would have been error by the trial court.
Now we consider the contention that, conceding a jury question on the false statement issue, what about the contention that the issue legally created legitimate and arguable reasons sufficient to confine a recovery to that amount actually due under the policy? As said in Veal supra, if this was done, the company would not be liable for punitive damages. As hereinbefore stated we now clearly state our position on that question.
1. At the conclusion of the evidence, the trial court at the request of the defendant, should determine whether or not, as a question of law, the insurer had a legitimate or arguable reason to deny payment of the claim. Of course, such a reason should be a reasonable one. If the trial court finds that such a legitimate or arguable claim existed, as shown by the evidence, then the trial court should refuse to grant a punitive damages instruction even though it submits to the jury the question of whether or not the insurer owed the compensatory claim for which proofs of loss were filed. Legitimate or arguable defenses do not mean that the insurer is entitled to a directed verdict on payment of the claim. The trial court, of course, has the question as to whether or not as a matter of law the insurer had the right to deny payment of the actual money claimed under the policy.
2. In the event the trial court determines that as a matter of law it cannot hold that the insurer had a legitimate and arguable defensive position, but that the evidence constituted disputed facts as to whether or not such situation existed, then the trial court should submit that issue to the jury.
The statement in paragraph 2 above is the situation we have in the case sub judice. The evidence clearly made a question *810 for the jury as to whether or not the appellant had a legitimate and arguable reason to prevail in its affirmative defense that the answers given by McGee on the application were of such a nature that the policy could be arbitrarily voided ab initio.
3. After deciding the threshold question of whether or not it is a jury question on the issue of legitimate or arguable reason to deny or cancel, the trial court then should make a determination as to whether or not the evidence is sufficient to submit a punitive damages instruction to the jury under the guidelines set out in Veal, supra.
A case similar to the above holding is shown by the opinion in Henderson v. United States Fidelity & Guaranty Co., 620 F.2d 530 (5th Cir.1980). There the Court of Appeals, using the guidelines set out in Veal, reversed the cause for submission of the punitive damage question to the jury. The Court of Appeals quoted parts of the Veal opinion. It further discussed other cases from this Court regarding the punitive damages question. For instance, they said that "Punitive damages are denied when the insurance company defends, rather than settles, a close case." Farmers Gin Co., v. St. Paul Mercury Indemnity Co., 186 Miss. 747, 191 So. 415 (1939); ... "when it honestly contests the amount of damage." Progressive Casualty Insurance Co. v. Keys, 317 So.2d 396 (Miss. 1975); ... "when it contests coverage because the insured has failed to meet a policy condition." Lincoln National Life Ins. Co. v. Crews, 341 So.2d 1321 (Miss. 1977). The Court in Henderson, went on to say that:
Punitive damages were allowed when an insurer used its superior bargaining position to delay in paying any part of separate claims, despite the insured's dire financial straits, because of an unwritten policy to pay the whole claim at once. Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829. (Miss. 1979).
(620 F.2d at 536.)
In discussing Veal and in reversing the cause for a determination of the punitive damages question to the jury, the Court of Appeals said:
This reversal is proper even though under Mississippi caselaw, USF & G had an arguable defense to coverage, which ordinarily would be sufficient to immunize its actions from punitive sanctions. If Henderson's position is accepted, UFSF & G's act in hiding the policy render ineffectual any other defense it had to the punitive damages claim.
(620 F.2d at 537).
Appellant's principal arguments are contained in its motion for judgment notwithstanding the verdict. As hereinbefore stated, the argument was concentrated on the question as to whether or not as a matter of law appellant had a legitimate or arguable basis for cancelling the policy ab initio after claim was made, and that therefore the lower court erred in submitting the question of punitive damages to the jury. The lower court in its opinion on appellant's motion for JNOV first held that without a doubt there was a jury question on appellant's affirmative defense of material, false statements by McGee in completing the application. The motion and opinion in reality went to the question of submitting a punitive damage instruction to the jury. What at first blush appears to be a confusing situation occurred when the trial court in its opinion on the motion stated:
It is the opinion of this Court that a reasonably arguable defense was presented in the trial of this case at the time of the trial, by Reserve Life On that basis, taken alone, the undersigned is of the opinion that Reserve Life should not be held liable for punitive damages.
The trial judge then went on to use much stronger language than the Court of Appeals for the Fifth Circuit used in Henderson, supra, where it said:
This reversal is proper even though under Mississippi case law USF & G had an arguable defense to coverage....
The trial judge in the present case overruled appellant's motion by using very strong language. It held as follows:

*811 But this court is of the further opinion that "good faith" on the insurer's part cannot commence with the trial or the litigated portion of the dealings between the insurer and the claimant in a vacuum, unrelated to the entirety of the relationship between the parties. This Court is of the opinion that the insurer owes to the insured a duty to deal in good faith, and vice versa, from the inception of the relationship leading up to the issuance of the contract. Where the defendant has violated this duty to act in good faith punitive damages are appropriate to protect the plaintiff, and more importantly, the public, from intentional wrong, insult, abuse or gross negligence on the insurer's part. Michael v. National Security Fire and Casualty Co., supra. It is this Court's opinion that considering the entirety of the relationship between the parties from its inception there was substantial evidence upon which the jury could find abuse of the plaintiff by Reserve Life and insult to the plaintiff and the public. The jury could easily conclude from the facts presented the following:
(a) Plaintiff was an uneducated man, easily led and imposed upon;
(b) A glib talking salesman with a substantial commission to be earned "talked through" the application with claimant, asking all the questions, in plaintiff's home;
(c) Dr. Edgar Bobo was claimant's personal physician which was made at the time the application was taken.
(d) Permission was given Reserve Life with the application to communicate with Dr. Bobo and obtain all relevant data concerning his prior medical history.
(e) Simply communications with Dr. Bobo would have revealed any prior transient ischemic attacks, which were alleged to be the misrepresentation in question;
(f) The prior transient ischemic attacks had nothing to do with plaintiff's bladder cancer for which benefits were claimed under the policy;
(g) Notwithstanding written permission, Reserve Life wrote the policy without communicating in any way with Dr. Bobo;
(h) Any misrepresentations by Plaintiff were innocent ones.
(i) Reserve Life waited until a claim was filed but then utilized its permission to conduct an intensive investigation of plaintiff's prior medical history.
(j) Reserve Life received and kept monthly premiums for five months after the claim was made before rejecting the claim.
After hearing the entirety of the testimony it is the undersigned's personal conviction that Reserve Life was guilty of gross negligence, manifest bad faith and abuse of the plaintiff, considering the relationship of the parties as a whole from its inception. Hospital and medical insurance is absolutely essential in this era of astronomical medical costs. Plaintiff cannot now obtain such insurance. Quite likely he could have obtained such insurance at an increased premium at the time the application was made and the time Reserve Life evaluated this risk, even if the transient ischemic attacks came into light. To allow Reserve Life to "sandbag" and gloss over its investigation of plaintiff's medical history at the time of evaluating the underwriting risk then comb intensively for five months his prior records after a claim is made "looking for a defense" (even based on a condition unrelated to his benefit claim) and then deny coverage "in good faith" is to invite manifest abuse of the public in such relationships. Under such circumstances punitive damage awards provide the public with its best protection from such abuse of this relationship between insured and insurer. The Court is of the opinion that it was correct in submitting the case to the jury on the issue of punitive damages.
So that there may be no confusion as to what we are holding in the case sub judice, we repeat what we previously have said: At the conclusion of the evidence, a question *812 arose as to whether or not as a matter of law the trial court should say that the insurer had a legitimate or arguable reason concerning coverage of the claim. Under the record in this case, we are of the opinion that if at that point the trial court had held that the insurer had such a reason concerning coverage, that holding would have been error. As stated, the evidence clearly made a question for the jury under appellant's affirmative defenses.
Without being critical, it is obvious that the lower court in the present case did not fully comprehend what it was saying when it, out of context, made the statement in its opinion that a reasonably arguable defense was presented. This is entirely inconsistent with the remaining part of its opinion quoted above in which the lower court in effect says that the plaintiff appeared to be entitled to punitive damages as a matter of law. If the trial court should have held, on proper request, that appellant, as a matter of law, had a legitimate or arguable defense, this would have been error. Of course, it is elemental that the question of punitive damages is for the jury to decide under proper instructions. These were requested and given by the trial court.
In summary we find that the evidence in the record before us clearly presents a question for the jury as to whether or not McGee made a material, false statement in his application which gave appellant sufficient reasons to take the action set out in its affirmative defense. Also, a jury question was made as to whether or not the evidence under the affirmative defense was sufficient to furnish appellant with a legitimate or arguable ground to cancel the policy ab initio.
Thirdly, ample evidence appears in the record for the jury, under proper instructions, to determine in its discretion, if punitive damages should have been assessed against appellant. We further hold that the evidence taken as a whole under the authorities hereinbefore discussed, required the submission to the jury of the punitive damages instruction.
We note the amount of punitive damages for the benefit of those reading this opinion. The amount is not assigned as error, nor is there a request for a reduction by this Court. Appellant put all of its eggs in one basket. We, therefore, technically should not reach this issue.
We have said in many cases that the amount of punitive damages is a discretionary question for the jury, saying:
It is the long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might be, interference therewith, unless for exceptional causes, is discouraged ... . the reason being that, as the jury are the sole judges of the amount which ought properly to be assessed in order to inflict adequate punishment, the courts should scrupuously avoid any undue interference with their prerogative... . ([Yazoo & Mississippi Valley Railroad Co. v. Williams] 87 Miss. [344] at 355-356, 39 So. [489] at 491).
(Snowden v. Osborne, 269 So.2d 858 at 861 (Miss. 1972)).
See also: Yazoo & Mississippi Valley Railroad Co. v. May, 104 Miss. 422, 61 So. 449 (1913); Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977).
In the above quote we note the words "unless for exceptional causes.". Out of an abundance of caution we have compared this case with others. Here the award was in the amount of $158,000. The admitted net worth of appellant's assets only was $102,259,474.
In Richards v. Allstate Ins. Co., 693 F.2d 502 (5th Cir.1982), the final award was $750,000 as punitive damages on an actual damage verdict of $2,500. Under the reasons given in the cases discussed herein and many others for awarding punitive damages, we cannot say that the award here was excessive and change it for "exceptional causes."
AFFIRMED.
*813 PATTERSON, C.J., and ROY NOBLE LEE, HAWKINS and DAN M. LEE, JJ., concur.
ROBERTSON and PRATHER, JJ., specially concur.
WALKER and BROOM, P.JJ., dissent.

APPENDIX A

*814 
ROBERTSON, Justice, specially concurring:
The majority opinion states a three step procedure to be followed by trial judges in handling bad faith tort and punitive damage claims. Majority opinion, pages 809-810. With sincerest respect for my colleagues, I suggest that this portion of the majority opinion contains two fundamental deficiencies. First, the language employed *815 fails to convey with reasonable precision the process to be followed. Second, and by far more important, the procedure announced (if I understand it) makes bad law.
I join nevertheless in today's decision affirming as it does the punitive damages judgment entered in the court below. I have reached this conclusion by a route different from that adopted by the majority. Because our methodological differences are of some moment and ought be made clear, I file this opinion.

I.
Beginning with Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239, 248 (Miss. 1977), we have been struggling to decide and articulate when in cases such as this the plaintiff insured becomes entitled to have the jury consider his punitive damages claim. We have created a linguistic bog. Being ex-lawyers we routinely eschew use of one word when two or three will do just as well.
From Veal through the case at bar, we have bandied about "legitimate reason", "arguable reason" and now "reasonable reason". Professing skills in precision use of language, we have become masters of obfuscation. With respect, the majority reaches new heights  and in the most important section of its opinion  that outling the principles to be employed in determining whether the bad faith tort and punitive damages claim should be submitted to the jury, at pp. 809-810.
In the first place, "legitimate" and "arguable" and "reasonable" are surely synonyms, at least in this context. The majority states that, to avoid a jury determination of punitive damages, the insurer must have "had a legitimate or arguable reason to deny payment of the claim". Majority opinion, p. 809. The opinion then states, "Of course, such a reason should be a reasonable one." There is I insist no such thing as a "legitimate reason" which is not by definition a "reasonable reason". The same of "arguable reasons". Clarity demands that we jettison two of these snyonyms. I would salvage "arguable".
More important is the idea our words ought to convey. Our opinions from Veal to the present mask what is involved in ascertaining whether an insurer has an arguable reason to deny payment of a claim. In the present context, we must (if logic and fairness retain roles in our law) mean: If the insurer has at trial asserted a defense to the claim  lack of coverage, an affirmative defense, or whatever, and if the state of the evidence after all parties have rested is such that under our familiar rules regarding when it is proper that a factual issue be taken from the jury, see, e.g., Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), the plaintiff insured is not entitled to a peremptory instruction on the underlying policy claim, at that point as a matter of law the insurance company becomes insulated from an award of punitive damages.

II.
When the test just stated is applied to the case at bar, the bad faith tort claim was properly submitted to the jury. There is no jury issue on the basic question of Reserve's liability under the McGee policy. McGee was entitled to a peremptory instruction on that claim. He was, therefore, entitled at the very least to have his bad faith tort claim submitted to the jury.
Reserve has charged that McGee made a false statement on his application and that this gave Reserve the right to cancel the policy. We are told that there is a jury issue here. See Majority opinion, pp. 809, 812.[1] In my view there was no issue of "false statement"  without a false statement issue, there can be no issue as to *816 whether Reserve had an arguable reason to cancel the policy.
As I understand the facts, Reserve's position at trial ultimately boiled down to its claim that, prior to the issuance of the policy, McGee had been treated for "transient ischemia attack" and that he had not disclosed this at the time of the application. This is utter nonsense.
At the time of the application, McGee disclosed the name of a Dr. Bobo of Pearl, Mississippi. He also executed the proper form authorizing Dr. Bobo to release to Reserve any information requested by Reserve. I would hold that, as a matter of law, where an insured does this in his application for insurance, the insurance company is charged with knowledge of all information in the doctor's records and everything the doctor may personally have remembered about the applicant.
In this case, once Reserve got around to checking with Dr. Bobo, it discovered that Dr. Bobo had seen and treated McGee some 11 times between February 13, 1976, and February 18, 1980, the day of the policy application. Specifically Dr. Bobo's records reflect treatment for TIA [transient ischemia attack] on June 16, 1978, and June 2, 1979. I would hold that, at the time it accepted the risk and issued the policy in question, Reserve is deemed to have known what its later investigation via Dr. Bobo revealed.
It seems to me that insurance companies ought to be happy with this approach. By checking with prior treating physicians, they can obtain accurate medical history of an insurance applicant. Few laymen are able to describe fully their medical history. This is particularly so in the case of one like Mr. McGee who has only a third grade education. McGee's disclosure of his prior relationship with Dr. Bobo gave Reserve access to better information than it would have had if McGee had stumbled through his personal recollections of his medical history.
In this context, I would hold that Reserve's affirmative defense of material false statement was inadequate as a matter of law. Had McGee moved that it be stricken at the end of the proof, that motion should have been granted. Beyond that, all agree that the current claim for treatment related to McGee's urinary tract is within the coverage of the policy. There being no policy defense as a matter of law, I would hold that McGee was entitled to a directed verdict that Reserve is liable to him on the underlying policy claim. In this respect, I disagree with the majority claim insofar as it holds that there was a jury issue on the question of liability under the policy.

III.
I conclude that (a) there was no jury issue on the question of Reserve's liability under the policy in question and (b) that McGee was entitled to judgment as a matter of law. For this reason I join in affirmance. If I saw the matter as does the majority, that there was a jury issue made out on the policy liability question, it would then in my mind follow as a matter of logic and law that the punitive damages issue should never have been submitted to the jury. I have briefly stated in Section I my view of how these cases should be handled. In the context of the case of bar, I present a more complete explanation.
In the present context, there is only one way there can be a relevant jury question on the matter of liability on the underlying policy claim. Having in mind the applicable rules of law  the privately made law contained in the insurance contract and the positive law found in the statutes and cases, there must have been some credible evidence presented to the jury which, if believed, would lead it to return a verdict for the insurance company.
If the evidence is such that a reasonable jury could find facts which would undergird a successful policy defense, the same evidence surely would justify a reasonable insurance company in so concluding. Standard Life Insurance Company of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), holds that:

*817 If an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, ... . 354 So.2d at 248.
An arguable reason is one in support of which there is some credible evidence. There may well be evidence to the contrary. A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts. And when we say this we are in essence articulating in an extrajudicial context our familiar rules regarding what proof is necessary to create a jury question. See, e.g., Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478-479 (Miss. 1983).
Alabama subscribes to the rule I urge we adopt. In National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala. 1982), the Supreme Court of Alabama held:
In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury. 419 So.2d at 1362.
See also, Freeland, et fil., Bad Faith Litigation: A Practical Analysis, 53 Miss.L.J. 237, 245-247 (1983).
If there is a jury issue on the underlying policy question, that is, if the plaintiff insured is not entitled to a peremptory instruction on his policy claim, then it follows a fortiori that the insurance company has an arguable reason for failing to pay the claim. In this world we live in, the reasonableness of jurors is not in fact different from the reasonableness of insurance claims adjustors. They are all people. The law ought not define differences in people that do not correspond to differences in fact.
The majority at page 809 states:
We state here that there was a clear question for the jury to determine whether or not Appellee made false statements on his application that would permit Appellant to cancel the policy months later, after claim made, under Section 83-9-11(3). A failure to have submitted this question to the jury clearly would have been error by the trial court.
If this is so, it follows as the night the day that the submission to the jury of the punitive damages issue was clear error by the trial court.
Near the end of the opinion the Court repeats the point stating:
In summary we find that the evidence in the record before us clearly presents a question for the jury as to whether or not McGee made a material, false statement in his application which gave Appellants sufficient reasons to take the action set out in its affirmative defense. Also, a jury question was made as to whether or not the evidence under the affirmative defense was sufficient to furnish Appellant with a legitimate or arguable ground to cancel the policy ab initio.
Again, if this be so, it follows as the seasons that Reserve was entitled to a peremptory instruction in its favor on the punitive damages issue.
Only because my reading of the record convinces me, for the reasons set out in Section II above, that McGee was entitled to a peremptory instruction on his claim on the policy do I join in holding that the issue of punitive damages was properly one for the jury.

IV.
It would be neat and tidy if we could simply hold that, at the conclusion of all of the evidence in a bad faith case, the trial judge should consider the question of whether a jury question is presented on an underlying policy defense, and that, if he holds that a jury issue has been made out, he should then direct a verdict in favor of *818 the insurance company on the punitive damages question. Such a procedure would have logical symmetry, but little else to recommend it. The real world is seldom neat and tidy.
This Court has repeatedly urged trial judges, faced with a motion for a directed verdict or a peremptory instruction, in doubtful cases, to go ahead and submit all issues to the jury, reserving the prerogative of "correcting" any jury verdict later on a motion for judgment notwithstanding the verdict. See, e.g., Astleford v. Milner Enterprises, Inc., 233 So.2d 524, 526 (Miss. 1970); Claiborne v. Greer, 354 So.2d 1109, 1111 (Miss. 1978). This, we say, saves needless retrials if on appeal we disagree with the trial judge and hold that a jury issue was made out.
In our trial courts there are many close cases. It requires no great insight  only candor  to note that frequently reasonable minds may differ whether a jury issue has been created. See, e.g., Pharr v. Anderson, 436 So.2d 1357, 1361-1366 (Miss. 1983). Jury questions, like beauty, are often in the eye of the beholder. There are many cases where the plaintiff is within an inch or two of losing his case via a peremptory instruction. If only our eyesight were good enough to determine with accuracy which side of the line his proof is really on.
Because such matters are gray and are often difficult to determine even with the benefit of the cool reflection on the record we are able to bring to bear, we urge our trial judges to submit such cases to the jury. This should be done in claims on insurance policies. On the underlying claim, it happens not infrequently that the evidence is close as to whether the plaintiff insured is entitled to a peremptory instruction as a matter of law.
In all bad faith tort cases against insurance companies, where in the opinion of the trial judge there is sufficient evidence to submit to the jury the issue of punitive damages, special verdicts under Rule 49(b), Miss.R.Civ.P., should be used. This should be done even where the trial judge is in doubt whether the plaintiff insured is entitled to a peremptory instruction on his policy claim. The appropriate fact questions on the underlying policy and the insurance company's affirmative defenses should be submitted as separate questions. Then, the appropriate questions on the bad faith tort and punitive damages issue should be submitted, if warranted by the proof.
Once the jury's special verdict is received, both the trial court and, in the event of an appeal, this Court, are in a position to render final judgment. Specifically, if on post-verdict motion and upon reflection the trial judge is of the opinion that he properly submitted to the jury the plaintiff's underlying policy claim, that is, that plaintiff was not entitled to a peremptory instruction on that claim, a punitive damages judgment is precluded as a matter of law. A holding by the trial judge that plaintiff was not entitled to a peremptory instruction is tantamount to a holding that the insurance company had "an arguable reason for failing to pay a claim" within the meaning and contemplation of the now famous dicta from Standard Life Insurance Company of Indiana v. Veal.
Where the Rule 49(b) procedure is employed, we are on appeal in a position to dispose of the case finally. Where we find plaintiff was not entitled to a peremptory instruction on the underlying policy claim, reversal of any punitive damages judgment inexorably follows.

V.
For the reasons described in the majority opinion, the evidence in this case was such that, under our heretofore existing rules of law, the punitive damages issue should be submitted to the jury. I have reviewed the jury instructions describing the circumstances in which the jury should consider an award of punitive damages and find them sufficient. As is pointed out in the majority opinion, we have before us no assignment of error challenging the amount of the jury's punitive damage award.
*819 For these reasons the judgment of the Circuit Court should be affirmed.
PRATHER, J., joins this opinion.
WALKER, P.J., joins Parts I and IV only.
WALKER, Presiding Justice, dissenting:
I respectfully dissent from the holding of the majority.
In my opinion the award of $158,000.00 in punitive damages was wholly unjustified. If there were ever a case where the insurance company had an arguable reason to refuse payment of the claim of $2,416.00, this is one.
When Mr. McGee made application for hospital and medical insurance with Reserve Life Insurance Company, he reported to the insurance company that he was in good health when, in fact, he was not in good health and had been to his regular physician for a total of eleven times within four years prior to his application to Reserve Life for hospital and medical insurance coverage. Among other things, he was treated for transient ischemia attack. The first treatment for the condition was on June 16, 1978 and the second on July 2, 1979. Mr. McGee's physician, Dr. Bobo, defined transient ischemia as being a "little stroke." The doctor also stated that there was a probability of the transient ischemia occurring in the future and getting worse as Mr. McGee gets older. The doctor testified that he felt sure that he had advised Mr. McGee of his condition and that Mr. McGee was capable of understanding what the doctor was telling him about transient ischemia attacks.
The uncontradicted testimony of Reserve Life's underwriter was that the policy would have been rejected if the company had known of the transient ischemia attacks.
Certainly with this after-acquired information obtained by the insurance company relative to Mr. McGee's actual physical condition, the insurance company was amply justified in refusing to pay the $2,416.00 hospital and medical expenses claimed to be due under the policy. It might very well be that a jury would find otherwise, but, if there were a jury issue made on the question of whether the insurance company was liable for the medical payments under the policy, then, in my opinion there was no issue to be submitted to the jury on the question of punitive damages as a matter of law.
The majority opinion will no doubt bring on a flood of similar law suits if for any reason an insurance company denies coverage under a policy. After all Mr. McGee has received $160,416.00 as a result of his own misrepresentation. Something is wrong with such a system. The ultimate loser will be the general public  policyholders  who will have to pay the bill through higher premiums.
This case cries out for legislative action which would limit recovery to actual expenses received in bringing suit plus double or triple the sum found to be due under the policy. Such a procedure would provide an adequate remedy to policyholders who had a legitimate claim against a recalcitrant insurance company.
BROOM, P.J., joins this dissent.
NOTES
[1] A point needs to be made clear. If the majority is suggesting that there was a jury issue presented on Reserve's material false statement defense so that McGee was not entitled to a peremptory instruction, the majority is wrong. If the majority is suggesting that there was a jury issue in the sense that Reserve was not entitled to a peremptory instruction, the point is merely irrelevant.