574 So.2d 654 (1990)
Thomas McCANN
v.
GULF NATIONAL LIFE INSURANCE COMPANY, INC., a Mississippi Corporation; The Mississippi Insurance Company, Inc., a Mississippi Corporation.
No. 07-CA-59094.
Supreme Court of Mississippi.
December 19, 1990.
*655 David C. Frazier, Gordon Myers & Frazier, Pascagoula, Pete Halat, Jr., Halat & Sherry, Biloxi, for appellant.
Maurice Dantin, Forest M. Dantin, Dantin & Dantin Firm, Columbia, for appellee.
William Liston, Liston & Lancaster, Winona, Charles T. Yoste, Starkville, for amicus curiae.
En Banc.

ON PETITION FOR REHEARING
SULLIVAN, Justice, for the Court:
The original opinions in this case are withdrawn and these opinions are substituted therefor.

FACTS
On February 19, 1985, Joe McDonald, an agent for Gulf National Life Insurance Company and The Mississippi Insurance Company, Inc. (hereinafter GNL/MIC), and Terry Lynn Keys, a trainee, went to the home of Thomas and Lessie McCann to solicit burial insurance as part of a deal worked out between GNL/MIC and Baylous Funeral Home. Keys was a representative of Baylous and was training in that capacity.
The McCanns decided to purchase two burial policies apiece. Each policy had a face value of $500. Joe McDonald took charge of filling out the applications as the McCanns supplied the answers to the questions he asked from the applications. During the application process, Mr. McCann was told he would be the beneficiary on his wife's policy and Mrs. McCann would be the beneficiary on his. The applications were sent to GNL/MIC and in March of *656 1985, the policies with applications attached were returned to Keys.
Upon receiving the policies, Keys removed the applications. McDonald returned to town in order to accompany Keys to the McCanns to deliver the policies. Company procedure dictated that the policies be delivered with applications attached. The policies were folded and put in jackets. When McDonald and Keys arrived at the McCann residence, McDonald removed the policies from their jackets and explained each paragraph of the policies to the McCanns. He then gave the policies to them.
Mrs. McCann died on November 1, 1985, of cardiac arrest. A claims statement was received by GNL/MIC on December 11, 1985. Attached to the claim was the death certificate. Michael Cavanaugh, corporate counsel for GNL/MIC, examined the application, the death certificate, the claimant's statement, and the physician's statement. Based upon that examination, he wrote a letter to Mr. McCann denying the claim because "at the time of making the applications for the policies, the insured was suffering from a serious illness and failed to disclose the condition of the health of the deceased." The letter directed Mr. McCann to get in touch with Cavanaugh if he knew of any circumstances which might change the outcome.
Yvonne McCann Laster, the McCanns' daughter, contacted Keys when the claim was refused. Keys at that time told Laster that she had a copy of the application. Keys read the application to Laster after which Laster told Keys that her mother would not have lied on the application. Keys did not contact GNL/MIC with this information.
Mr. McCann brought this suit to recover both actual and punitive damages. Before the suit could be tried, Mr. McCann died and his daughter was substituted as plaintiff. At the close of the trial, the court granted a Motion for a Directed Verdict for the face value of the policies. The judge also sustained a Motion for a Directed Verdict on the issue of punitive damages. This is an appeal of the court's ruling on punitive damages.

LAW
Under the principles of agency, an insurer is bound by the acts of its agents. See Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1180 (Miss. 1990); Southern United Life Ins. Co. v. Caves, 481 So.2d 764, 766 (Miss. 1985); and American Casualty Co. v. Whitehead, 206 So.2d 838, 842 (Miss. 1968). Miss. Code Ann. § 83-17-1 (Supp. 1990), which defines an agent, was enacted "to prevent insurers from operating through third persons and later denying responsibility for the acts of those persons."[1]Ford v. Lamar Life Ins. Co., 513 So.2d 880, 888 (Miss. 1987).
The doctrine of estoppel is applicable to the agency relationship.
The essence of estoppel is that the party asserting the agency was deceived by the conduct of the party against whom it is asserted, and, though fraud may be an ingredient of the case, it is not essential. The principal need not authorize the agent to practice a fraud on third parties, yet if he authorize his agent to transact the business with a third party, and in so doing the agent practices the fraud on the party, the principal is liable.
American Bankers' Ins. Co. v. Lee, 161 Miss. 85, 104, 134 So. 836, 839 (1931) [quoting Germania Life Ins. Co. v. Bouldin, 100 Miss. 660, 678, 56 So. 609, 613 (1911)]. *657 Thus, an insurer, through its agent's actions, may be liable for both actual and punitive damages. Independent Life & Acc. Ins. Co. v. Peavy, 528 So.2d 1112, 1115 (Miss. 1988).
Punitive damages may be awarded when an insurer refuses to pay an insured's claim if denial of the claim is "attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort." Gulf Guaranty Life Ins. Co. v. Kelley, 389 So.2d 920, 922 (Miss. 1980). See also Blue Cross & Blue Shield v. Maas, 516 So.2d 495, 496 (Miss. 1987) and Progressive Casualty Ins. Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975). If the evidence supports a finding of an independent tort, the issue should be submitted to the jury. Commodore Corp. v. Bailey, 393 So.2d 467, 471 (Miss. 1981). If the insurer has an arguable reason for refusing the claim, however, punitive damages are not proper. Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 248 (Miss. 1978).
Agent fraud or misrepresentation in the application process has been enough in Mississippi to allow the issue of punitive damages to be submitted to the jury. In National Life and Acc. Ins. Co. v. Miller, 484 So.2d 329 (Miss. 1985), Mrs. Miller purchased life insurance for her husband and son and for herself. During the application process, the insurance agent was accompanied by the staff manager of the company. The staff manager filled in the answers on the application as Mrs. Miller supplied them.
When Mrs. Miller was asked, among other things, if any of the proposed insureds had been treated for heart disease, she answered that her son had a heart murmur and had been in the hospital within the last five years. On the application, the manager marked `no' to the question. The child later died during open heart surgery and the insurance company refused to pay the claim. The agent told the company that he had not known of the condition.
We said that in cases where the agent takes charge of the application or suggests the answers to the questions, "the company shall not avoid the policy because they are false or untrue, if full disclosures were made by the applicant to him." Id. at 334 [quoting Planters Ins. Co. v. Myers, 55 Miss. 479, 507 (1877)]. Moreover, where the agent is guilty of misrepresentation, the question of punitive damages is one for the jury because a jury might justifiably find that the agent's actions were so willful or of such gross negligence as to evidence a reckless disregard for the rights of the insured. Id. at 336.
The case of Southern United Life Ins. Co. v. Caves, 481 So.2d 764 (Miss. 1985), supports the award of punitive damages where an agent has knowledge of a pre-existing condition of the insured but fails to communicate that knowledge to the insurance company and subsequently, the insurer refuses a claim because of the pre-existing condition. In Southern, the insurer's agent was personally acquainted with the proposed insured and knew that he had suffered a heart attack eight years earlier.
We held that the knowledge of the agent was imputed to the insurance company. Punitive damages were allowed since "Southern knew or should have known that as a matter of law, it had no arguable or legitimate reason for refusal. Furthermore, even after the claim arose, Southern made no attempt to contact its agent to determine what imputable knowledge she had." Id. at 768.
A recent decision allowing punitive damages for misrepresentations by an agent is Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172 (Miss. 1990). Willie Williams was persuaded by agents of Andrew Jackson to drop his retirement plan with another insurance company and enroll in the supplemental retirement program with a death benefit offered by Andrew Jackson. He was assured that he would be covered immediately upon completing the application and signing his payroll deduction card. The application was filled out by one of the company's agents as Williams and his wife supplied the answers.
Williams' wife died several weeks later. He had not yet received his policy although he had been told he would receive it in two *658 to three weeks. Williams filed a claim which was refused by Andrew Jackson. The company denied the claim on the basis that the underwriting process was still in progress when Williams' wife died. Furthermore, on information obtained during this process, his wife was determined to be uninsurable because of an undisclosed heart condition. Williams contended that a contract had been formed with the agents and that he and his wife had disclosed his wife's condition to the agents during the application process.
We upheld the award of punitive damages. Ostensibly, Andrew Jackson "knew (through Willie's pre-complaint information) or constructively knew (through imputation) or should have known (through diligent and thorough investigation) about its agents' misrepresentations. Such misrepresentations created a jury issue of whether Andrew Jackson's denial was arguable." Id. at 1187. Additionally, the evidence was sufficient for the jury to conclude that the mishandling of the claim may have given rise to an independent tort. In such a case, the jury should be allowed to resolve the issue. Id.
Furthermore, punitive damages have been awarded where an insurance company has failed in its duty to adequately investigate the claim made by the insured. In Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985), an insurance company denied the insured's claim for the accidental loss of his lower right leg. The insurance company relied only upon a report from Equifax Service plus three medical entries which the insured had included with his claim. Thus, the company failed to "make a proper investigation, and on incomplete information told [the insured] his claim was denied... . Then, they told him if he had any further information to submit it, assuming no responsibility of checking the facts further themselves." Id. at 273.

APPLICATION OF THE LAW TO THE FACTS
The reason given by GNL/MIC for denying the claim made by Mr. McCann was that Mrs. McCann failed to disclose her pre-existing condition of hypertension. Those present during the application process when Mrs. McCann allegedly failed to disclose her condition were Mr. and Mrs. McCann and the agents for Gulf National, Joe McDonald and Terry Lynn Keys. Unfortunately, Mr. McCann died before the case came to trial and was therefore unable to tell his version of what occurred during the application process.
The agents agree that McDonald took charge of filling out the applications for the McCanns. However, their versions differ as to the signing of the applications. Keys testified that she saw each of the McCanns sign their own applications. McDonald testified that Mrs. McCann signed her application but that Mr. McCann, when presented with his application, told McDonald to let his wife sign it. Mrs. McCann then signed the application.
Significantly, evidence was offered at trial which disputed both these versions. Frank Hicks, a handwriting expert with the Mississippi Crime Lab, examined the applications of the McCanns along with twelve specimens of Thomas McCann's handwriting and fifty-eight specimens of Lessie McCann's handwriting. From these, he determined that the signatures on the applications were not those of Thomas and Lessie McCann.
Once the applications were completed, they were sent to GNL/MIC. GNL/MIC then issued the policies and returned them to Keys with the applications attached per company policy. Keys, upon receipt and before delivery, removed the applications from the policies.
McDonald and Keys returned to the McCann residence to deliver the policies and explain the contents. McDonald testified that he removed the policies from their jackets so that he could go over them paragraph by paragraph with the McCanns. The policies were then given to the McCanns without the applications attached. Keys testified that the policies were folded when delivered and McDonald never unfolded them.
*659 When Mrs. McCann died, Mr. McCann notified GNL/MIC of her death. Michael Cavanaugh, corporate counsel for GNL/MIC, denied the claim based on his study of the application, the death certificate, the claimant's statement, and the physician's statement. He then put the burden on Mr. McCann to notify GNL/MIC if he had any additional information.
The death certificate indicated that Mrs. McCann died of cardiac arrest. Hypertension was listed as a significant condition. The physician's statement was completed by Dr. Rudeen, Mrs. McCann's doctor. He indicated that he had attended Mrs. McCann from March 1, 1976, to October 2, 1983. Specifically, he diagnosed hypertension on March 1, 1976.
The questions on Mrs. McCann's application were all marked `no' including one that asked if the applicant had ever suffered from high blood pressure. Cavanaugh denied the claim on the basis of the information contained in these documents. He made no effort to talk personally with Dr. Rudeen or to contact the agents. In fact, he said that the first knowledge he had that the applications had not been attached to the policies was when McDonald testified at trial.
At the close of the trial, GNL/MIC moved for a directed verdict on the issue of punitive damages. In sustaining the Motion, the court found that
there was no knowledge on behalf of either Defendant that there was any controversy about the application not being signed by Mrs. McCann or [sic] was there any knowledge on behalf of the Defendants showing that there was any policy delivered to the McCanns with the application removed, as the Defendants had mailed from their home office the policies with the applications attached, and then removed after being received at Baylous Funeral Home by Terry Lynn Keys. That this act of Terry Lynn Keys, as the proof will bear out, was an act that was not malicious or gross or reckless disregard for the right of the McCanns but was a simple act of mistake or negligence.
This reasoning is contrary to the agency principles which we have consistently applied in an insurance context. As in Andrew Jackson Life Ins. Co. v. Williams, supra, GNL/MIC knew or constructively knew or should have known about its agents actions concerning the applications. As in Southern United Life Ins. Co. v. Caves, supra, GNL/MIC made no effort to contact the agents, Keys and McDonald, to determine what imputable knowledge they might have had. Instead of adequately investigating the claim, GNL/MIC put the burden on Mr. McCann to let them know if he had additional information.
The removal of the application from the policy by Keys may have been a mistake. However, McDonald testified that he went over each paragraph of the policy with the McCanns. McDonald, who knew that company policy dictated that the application be attached to the policy, could hardly have been unaware that the application was missing.
The credibility of both Keys and McDonald is at issue. Their testimony not only contradicted each other's but was also rendered doubtful by the testimony of the handwriting expert.
Punitive damages are awarded by the courts in order that defendants be punished for wrongdoing. They also protect the public by serving as an example to others who may contemplate similar wrongdoing. Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972). "If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity." Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239, 248 (Miss. 1978).
The evidence offered at trial indicated that the question of whether GNL/MIC had an arguable reason for denying Mr. McCann's claim should have been submitted to the jury. The acts and knowledge of the company's agents, McDonald and Keys, were imputed to GNL/MIC.
That the agents committed fraud in the application process could have been inferred *660 from the testimony of the agents and the testimony of the handwriting expert. Another indication of fraudulent activity on the part of GNL/MIC was the fact that the McCanns were told they would be named as each other's beneficiary but the application named Baylous Funeral Home as the beneficiary. The case is clearly within the ambit of bad faith insurance cases where the jury is allowed to decide the question of punitive damages. To decide otherwise defeats the purpose of § 83-17-1 which was enacted to prevent insurance companies from denying liability for the acts of third persons.
PETITION FOR REHEARING GRANTED; REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF PUNITIVE DAMAGES.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, ANDERSON and PITTMAN, JJ., concur.
ROY NOBLE LEE, C.J., and BLASS, J., dissent.
BLASS, Justice, dissenting.

A.
I must dissent. The defendant denied the claim on December 30, 1985, based on a review of the death certificate, the application, the claimant's statement and the physician's statement. The treating physician's statement indicates that he had been treating Lessie for hypertension since March 1, 1976. The death certificate states that the cause of death was cardiac arrest. Other significant conditions contributing to the death included hypertension. However, the application states that Lessie did not suffer from high blood pressure. Therefore, at the time of the initial refusal, in December 1985, consistent with Blue Cross & Blue Shield, Inc., et al. v. Campbell, 466 So.2d 833 (Miss. 1984) the company had a "reasonably arguable basis" to deny the claim.
However, in accord with Miss. Code Ann. § 83-17-1 (Supp. 1989), Keys was acting as an agent for GNL/MIC when she sold the policy. She obtained applications from potential insureds; forwarded the application to defendants; collected premiums for the defendants; and eventually received a certificate of authority in 1986, authorizing her to write insurance for the defendants. Once the company became aware that Keys and McDonald had filled out the policy, and the application was not attached when the policy was delivered to the insured, GNL/MIC could not avoid the policy due to false or untrue statements on the application. National Life and Accident Ins. Co. v. Miller, 484 So.2d 329, 334-37 (Miss. 1985).
For the majority it easily follows from this that a principal must also pay unlimited punitive damages for the acts of its agents, even though the company neither ratified nor approved of such conduct. For me, the result is not so obvious. Indeed there are some jurisdictions that have adopted the approach favored by the majority but the opposite, and in my mind correct, rule is also in effect in many jurisdictions. See, W. Shernoff, S. Gage & H. Levine, Insurance Bad Faith Litigation, § 8.07[1], nn. 4-5 (1989).
The better rule is embodied in the Restatement (Second) of Torts § 909 (1977). It requires that before one is entitled to collect punitive damages against a principal for the acts of an agent a plaintiff must prove that the agent acted with the state of mind required for a punitive damages award and:
(1) the principal or a managerial agent authorized the doing and the manner of the act; or (2) the agent was unfit and the principal or a managerial was reckless in employing or retaining him or her; or (3) the agent was employed in a managerial capacity and was acting in the scope of employment; or (4) the principal or a managerial agent of the principal ratified or approved the act.
Id.
This approach ensures that principals are not punished for actions of employees unless they ratify the conduct, tacitly or otherwise. Imposing punitive damages in the absence of such conduct by the employer is merely a thinly veiled scheme to redistribute the wealth. Worse still, punishing *661 "good" and "bad" employers alike does not put employers on notice as to what type of conduct to avoid to protect themselves from harsh punitive damage awards. Here the majority specifies no conduct by the employer or its managerial personnel that is worthy of blame other than the cynical suggestion that they should have known that their agents would act dishonestly.
Other states have enacted statutes that focus on the conduct of the employer. Kentucky, for example, recently enacted a statute that says: "[i]n no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question." Ky. Rev. Stat. Ann. § 411.186(3) (Michie/Bobbs-Merrill 1990). I can only hope that the legislature of our state enacts a similar statute.

B.
The principal is only liable for the acts of an agent acting within the scope of his authority or employment. Miller, 484 So.2d at 336; Napp v. Liberty Nat'l Life Ins. Co., 248 Miss. 320, 159 So.2d 164 (1963); Southern United Life Ins. Co. v. Caves, 481 So.2d 764 (Miss. 1985). The letter refusing the claim clearly invites the insured to contact Michael Cavanaugh in the event of a dispute, "[i]f there are any questions or if there are any further circumstances which would throw a different light on this matter, please forward the information to me and we will re-evaluate this claim." After receiving the letter of denial, plaintiff Yvonne McCann Laster contacted Terry Lynn Keys in January 1986. Keys was a sales or soliciting agent for GNL/MIC. GNL/MIC never indicated in any way that Keys was authorized to handle the disputed claim and therefore the company cannot be charged with the knowledge of a dispute over the denial of the claim when Laster contacted Keys. Restatement (Second) of Agency §§ 268-282[1] (1958). GNL/MIC was not aware of the dispute until suit was filed in June, 1986. At that time GNL/MIC conducted an investigation and admitted liability on the face value of the policies.

C.
A plaintiff is not automatically entitled to submit a punitive damages issue to the jury by reason of the directed verdict on contract coverage. Campbell, 466 So.2d at 843. The test for submitting the issue of punitive damages to the jury is whether the defendant acted with malice or gross negligence and reckless disregard for the rights of the insured in handling the disputed claim. Scott v. Transport Indem. Co., 513 So.2d 889, 896 (Miss. 1987); Pioneer Life Ins. Co. v. Moss, 513 So.2d 927, 931 (Miss. 1987).
Appellant contends that this case falls squarely within the guidelines of Reserve Life Ins. Co. v. McGee, 444 So.2d 803 (Miss. 1983). In McGee, the company allegedly reviewed plaintiff's claim, but made no effort to contact his physician. Instead, the company elected to employ an investigator to exhaustively examine McGee's medical history. The agent who took McGee's application admitted falsifying the application, but significantly, the insurer did not question him as to this aspect of the claim. In McGee, the insurer aggressively defended against coverage. That is not the case here.
In National Life and Accident Ins. Co. v. Miller, 484 So.2d 329 (Miss. 1985), the agent, Dillon, who falsified the application, and his superior, who was present when the application was taken, tried to deny the falsification. Both were in a position to influence the payment of the claim, or at least notify the company of a problem, yet both actively resisted the claim. Here, *662 GNL/MIC promptly investigated the claim on notice of a dispute, admitted coverage, and offered to pay the face value of both policies.
In Blue Cross and Blue Shield Inc. v. Maas, 516 So.2d 495 (Miss. 1987) insured's medical coverage was terminated despite the fact that premiums were paid. Maas repeatedly contacted Blue Cross and his employer about the claim. After initiating an investigation, the company again rejected a medical claim and significantly failed to remit payment approximately six weeks after its investigation had found that the original claim was improperly denied. Undoubtedly this amounted to gross negligence. In this case, GNL/MIC's failure to act on the disputed claim was not due to gross negligence. GNL/MIC was unaware of the existence of the dispute until suit was filed. Plaintiff did not contact the company as directed in the letter of December 1985.
We do not characterize GNL/MIC's handling of the McCann's claim as malicious, grossly negligent or in reckless disregard for the rights of the insured. We can see none of the egregious behavior in this case which has justified the imposition of punitive damages in other cases. The trial court properly found that the denial of the claim did not reach the heightened status of an "independent tort." In light of the fact that the defendant here didn't act in a way deserving of punishment the directed verdict on punitive damages should be affirmed.
ROY NOBLE LEE, C.J., joins this opinion.
NOTES
[1] § 83-17-1 defines an agent as "Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, collect, or transmit any premium of insurance, ... whether any of such acts shall be done at the instance or request or by the employment of the insurance company, or of or by any broker or other person, shall be held to be the agent of the company for which the act is done or the risk is taken as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract."
[1] § 268 General Rule

(1) Unless the notifier has notice that the agent has an interest adverse to the principal, a notification given to an agent is notice to the principal if it is given:
(a) to an agent authorized to receive it;
(b) to an agent apparently authorized to receive it;
(c) to an agent authorized to conduct a transaction, with respect to matters connected with it as to which notice is usually given to such an agent, unless the one giving the notification has notice that the agent is not authorized to receive it;
* * * * * *