517 So.2d 521 (1987)
MUTUAL LIFE INSURANCE COMPANY OF NEW YORK
v.
ESTATE OF Ray Lamar WESSON, M.D., Deceased, by Emogene HALL, Administratrix as the Guardian of Ray Lamar Wesson, Jr., Allison Lynn Wesson, Dave Newton Wesson and Jason Manning Wesson, Minors; Corporate Planning, Ltd.; and W.A. Wimberly.
No. 56046.
Supreme Court of Mississippi.
November 12, 1987.
Rehearing Denied January 13, 1987.
*523 Natie P. Caraway, Richard D. Gamblin, Wise, Carter, Child & Caraway, Jackson, Roy C. Williams, Megehee, Brown, Williams & Mestayer, Pascagoula, J.P. Coleman, Ackerman, for appellant.
Paul S. Minor, Judy M. Guice, Minor & Benton, Clyde H. Gunn, III, Corban & Gunn, Biloxi, Charles R. Davis, Barry S. Zirulnik, Thomas, Price, Alston, Jones & Davis, Jackson, for appellees.
*524 En Banc.
ROY NOBLE LEE, Chief Justice, for the Court:
The administratrix of the estate of Dr. Ray Lamar Wesson, deceased, [Wesson] joined by the guardian of Dr. Wesson's four minor children, filed suit in the Circuit Court of Jackson County against Mutual Life Insurance Company of New York [hereinafter MONY], Corporate Planning, Ltd., and W.A. Wimberly for the sum of eighty-seven thousand one hundred thirty-six dollars ($87,136.00), face value of an insurance policy covering the life of Dr. Wesson and for punitive damages resulting from the insurance company's bad faith in declining to pay the policy amount. Corporate Planning, Ltd. and W.A. Wimberly, alleged to be agents of MONY, filed a cross-claim against MONY for damages, actual and punitive, for loss of business and injury to reputation. At the end of the trial, the lower court granted a peremptory instruction in favor of the latter two defendants on the claim against them by Wesson.
The jury returned a verdict for Wesson against MONY in the sum of $87,136.00, actual damages, and eight million dollars ($8,000,000) in punitive damages; and a verdict in favor of Corporate Planning, Ltd. and W.A. Wimberly against MONY in the sum of three hundred fifty thousand dollars ($350,000). MONY has appealed from the judgments.

I.
This discussion under Part I relates to the suit of Wesson against MONY.

Facts
In early 1974, Dr. Ray Lamar Wesson and Dr. Jerry Adkins organized the Surgical Clinic of Biloxi, P.A., a professional corporation. Through the advice and assistance of W.A. Wimberly and Corporate Planning, Ltd., his company, agents of MONY, the Surgical Clinic set up a retirement plan by forming a pension trust retirement plan designating Drs. Wesson and Adkins as trustees. The second company formed and owned by Wimberly, i.e., Corporate Investments, sold a MONY whole life insurance policy through the pension trust retirement fund to the Surgical Clinic insuring the life of Dr. Wesson.
The insurance policy was dated February 1, 1974, for a face amount of $87,136.00. Wimberly, as MONY's field underwriter, submitted the special class-employee policy application of Dr. Wesson to MONY, which application became a part of the policy. Question 9 of the application, together with the answer, follows:
9. Auto. Prem. Loan provision operative if available?
Yes X No ____
The Automatic Premium Loan provision referred to in Question 9 is set forth on page 11 of the insurance policy:
AUTOMATIC LOAN TO PAY PREMIUMS (Subject to conditions specified below)  This provision shall become operative if requested in the application for this Policy or whenever written request is received by the Company at its Home Office before any premium is in default beyond the grace period. It shall become inoperative, as to premiums not yet paid, upon (a) receipt by the Company at its Home Office of written request to that effect or (b) election of an Optional Benefit on Lapse within the grace period.
While this provision is operative and the loan value is at least as great as the total unpaid premium plus any existing indebtedness, each premium for this Policy due and not otherwise paid will be paid by automatic loan on the last day of the grace period. However, a premium shall not be paid by automatic loan if all premiums due during the twelve policy month interval prior to the due date of such premium have been paid by automatic loan and no payment toward indebtedness under this Policy has been made during such interval or during the grace period of such premium.
Further, Endorsement # 73500 was issued by MONY with the Wesson policy which strengthened insured's rights in connection with the original Automatic Premium *525 Loan (APL) provision, and provided in pertinent part:
Automatic Loan to Pay Premiums  This provision shall become operative if requested in the application for this Policy or whenever written request is received by the Company at its Home Office before any premium is in default beyond the grace period.
After receiving Dr. Wesson's application, MONY's Jackson, Mississippi, office forwarded it to the main office in New York, where Annie Kimmerle, an Installation Specialist in MONY's pension trust department, reviewed the application and sent it to the Policy Issue Department, with instructions that Dr. Wesson's policy be issued without APL. Kimmerle later testified that, although the application requested APL, she was aware of MONY's policy regarding APL and instructed Policy Issue accordingly. MONY was relying on an interpretation of non-transferability Endorsement # 64540 that it negated the effect of the APL provision. The endorsement in Dr. Wesson's policy read:
Neither the insured nor the beneficiary may sell, assign, discount, pledge or encumber any interests in this policy except to or through the Mutual Life Insurance Company of New York, and then only in accordance with the right conferred upon him or her under the terms of the Policy.
As a result of Kimmerle's instructions, Policy Issue coded its computer to reflect a "O" under the APL column in its master message printout (computer) to show that APL was not in that policy. Kimmerle then sent a memo to Don Coatsworth, office supervisor of the Jackson office, informing him of MONY's decision not to honor the APL request. Wimberly denied that this information was ever relayed from Coatsworth to him. The policy was then sent to Wimberly, who forwarded it to Dr. Wesson at the Surgical Clinic. Wimberly received a data card for his records, which card indicated that no APL was provided.
At trial, several pension trust policies, other than the Wesson policy, were introduced in evidence and they reflected that APL was requested in their applications, but no instructions were sent by Kimmerle to the Policy Issue Department. Notwithstanding that absence, the master message printout of those policies was coded "O" for the APL as was Dr. Wesson's policy.
After issue of Dr. Wesson's policy, MONY altered its Special Class-Employee Application to delete Question 9 relating to the offer of APL to the insured. Subsequently, MONY became aware that the Endorsement # 64540, mentioned above, did not negate the effect of a requested APL in a pension trust policy. This became clear as early as October 21, 1976, in an interoffice memorandum from Pauline Dana-Bashian to Mary Martini advising her that the non-transferability Endorsement # 64540 does not negate APL. Also, on October 27, 1976, Joan Rapp of MONY's Policy Forms Department, sent a memo to Don Coe of MONY's Sales Department, advising him that, although the policy application was changed in 1974, some policies still include APL and that "these issues are not endorsed to make APL inoperative."
On September 16, 1975, Lou Roth, Vice President and Chief Actuary of MONY, sent a memo to Rudy Vadala, Vice President and department head of MONY's Office Operations Department, wherein he set out that the Actuarial Department did not believe in selling the APL option; that if an insured is on the verge of lapse, MONY should inform him of his rights to continue the policy under APL; and that MONY should have a program of informing agencies and policyholders of the rights under the APL provision only when lapse or surrender seems imminent, and not on a massive scale to all policyholders.
When MONY learned of the ineffectiveness of the non-transferrability endorsement # 64540 in 1976, it was also apprised of a situation where a large number of pension trust policies had been coded in the computer to indicate that APL was operative. The code number appearing in the APL column of the master message print (computer printout) would have to be a number other than "O" to indicate an operative *526 APL provision. A memo from Delores Hart, Supervisor of MONY's Field Relations Program, to Yolanda Boytell, head of MONY's Quality Control Department, dated September 14, 1976, indicated that this was taking place:

APL's on Pension Trust and Profit Sharing Plans. Issue has been allowing APLs on Pension Trust and qualified profit sharing plans except for Master Annuity per Dot McCarthy and the Pension and Profit Sharing Manual. APL is not available on any Pension Trust and qualified plans. (I don't know about non-qualified). That's in parenthesis. Peg Hess will talk with Carolyn Beltnap and Dot to change their rules. Also, the Special Class Application (since 1974) do not ask if APL is wanted. However, what can we do to prevent APLs from processing on policies which allowed APLs which shouldn't be allowed? And, how and who corrects the ones which are incorrect at present? Please let me know what will happen with these. Seems that this is no small thing. Thanks, Dot.
MONY assigned Mary Martini the project of investigating and rectifying the problem.[1]
In a memo by Mary Martini to Don Raves, Sales Department, February 9, 1977, she estimated that 25,000 pension trust policies having APL provisions might be involved in the investigation. Her investigation revealed that pension trust and profit-sharing policies issued prior to May, 1974, were issued with APL, if requested on the application. After learning from Pauline Dana-Bashian's memo of October 21, 1976, that the current non-transferrability endorsement had no negative effect on APL provisions, Martini drafted sample letters to inform current policyholders of their operative APL provision, and its possible IRS implications. However, the letters were never sent to the policyholders, and the project was terminated.

Wesson's Death
On March 14, 1980, Dr. Wesson, along with his wife, died as a result of a plane crash in Poland, while accompanying the United States Amateur boxing team en route to a match against the Polish team. At the time of his death, the premium, which was due February 1, 1980, had not been paid. After being informed of Wesson's death, Wimberly contacted Emmie Holt at MONY's Jackson office to inquire about the status of the policy since the February 1, 1980, premium was unpaid. She relayed the request to MONY's home office in New York, and on March 26, 1980, MONY's New York office sent a TELEX message to Holt stating, "Since two premiums are due and unpaid and no APL provision was provided for, the policy will be lapsed to reduced paid up ($3,687.00)."
The grandmother of the Wesson children, beneficiaries of their father's policy, employed Attorney Clyde H. Gunn in the matter, and he contacted MONY on March 24, 1980, advising of Dr. Wesson's death and requesting a claims form. In May, 1980, Attorney Gunn sent in the claims form and copy of the policy to MONY and on June 2, 1980, MONY sent four form letters to its Jackson office informing them that the policy was lapsed to reduced paid-up value of $3,687.00. Attorney Gunn made demand for the full face amount on July 10, 1980, to which MONY replied on August 5, 1980, giving the same explanation as stated hereinabove. The Wessons filed suit against MONY on August 30, 1982.
In denying the claim MONY relied only on the master message print (computer printout). This modus operandi of MONY in evaluating a claim was uncontradicted. Although the master message print indicated that an APL provision was not in Dr. Wesson's policy, the testimony showed that only the application of Dr. Wesson listed the beneficiaries, and claims personnel referred to it at the time the claim was filed to ascertain the beneficiaries. Question *527 and answer # 9 indicating APL was on the application.[2]
Between the time of Dr. Wesson's death and the filing of suit, in early 1981, MONY unilaterally altered its computer to reflect a "O" for APL in its master message print on all tax qualified whole life policies. After suit was filed and discovery had, this action was found out. MONY then attempted to rectify the situation by identifying the policies which had requested APL, changing its computer to reflect such, and notifying policyholders of the risk they run of having their plans lose their tax-exempt status.
As a result of this investigation, MONY discovered fifty (50) death claims involving tax-sheltered policies, with eight (8) of those 50 being paid on a reduced paid-up basis. Of those eight, two, including Dr. Wesson, requested APL. The other policy was then paid in the full amount of its face value. Of the pension trust policies still in force, MONY discovered 1,614 policies which requested APL and were originally coded in its computer reflecting such, but were unilaterally changed to indicate no APL in 1981. MONY also discovered 182 policies wherein APL was requested but coded at issuance to indicate no APL. If Dr. Wesson had lived, his policy would have fallen into this latter category.
MONY discovered the existence of the APL provision in Dr. Wesson's policy just prior to the due date of its answer to the complaint. MONY was served with the complaint December 2, 1982. MONY notified local counsel in Jackson, Mississippi, of the complaint, telling him it was a simple lapse case and that he should defend it vigorously. Marion Marable, the person making contact with local counsel, relied upon the information contained in the master message print, notwithstanding that, at that time, the file was in his possession containing the complete policy. MONY's local counsel, while reviewing the policy with MONY personnel at its Jackson office, discovered the inclusion of the APL provision in the policy and MONY was notified of this by local counsel on October 11, 1982. MONY filed an answer, denying liability, but, on December 15, 1982, amended its answer, admitted liability and paid the face value of the policy, with interest, into court.
As a result of the suit, MONY took certain corrective measures. Also, it now requires its death claims personnel to review the application when evaluating a death claim.

Issues

A.

FAILURE TO GRANT MONY'S MOTION FOR DIRECTED VERDICT, REQUEST FOR PEREMPTORY INSTRUCTION, AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT.
MONY contends, under this assignment, that (1) there was no intentional refusal on its part to pay the Wesson claim; (2) MONY had no actual knowledge nor lack of arguable reason when it denied the claim; and (3) therefore, punitive damages were inappropriate.
The case we consider today is commonly characterized as a "bad faith insurance claim," viz, where an insurance company declines payment of a known, legitimate claim under an insurance policy without justifiable reason. Since Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), there have been at least sixteen (16) bad faith cases decided by this Court, involving the question of whether or not they were proper cases for the submission of the punitive damages issue to the jury. Thus, in the case sub judice, we are not travelling an undefined trail, but, rather, a well-marked highway. The phrase "arguable reason" for denying a claim excluding punitive damage liability first appeared in Veal and has been argued in most of the cases since that decision. For instance:
*528 In Travelers' Indemnity Co. v. Wetherbee, 368 So.2d 829 (Miss. 1979), the Court held a punitive damage instruction was proper and that the evidence was sufficient to support the verdict for damages thereunder arising from the intentional withholding of the contents coverage, a gross breach, the equivalent of an independent tort.
In Aetna Cas. & Surety Co. v. Steele, 373 So.2d 797 (Miss. 1979), the Court held there was an arguable reason to not pay the claim of appellee, and, under the ruling cases cited, punitive damages and attorney's fees are not proper.
In Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), the defendant failed to honor the legitimate claim filed following the death of plaintiff's wife and there was no reason whatever to justify its action. Punitive damages were proper.
In Reserve Life Ins. Co. v. McGee, 444 So.2d 803 (Miss. 1984), the Court held that where the evidence constituted disputed facts as to whether or not a certain situation existed, then the issue should be submitted to the jury on punitive damages.
In National Life & Accident Co. v. Miller, 484 So.2d 329 (Miss. 1985), the Court said:
Where these agents fail to correctly record Mrs. Miller's responses on the application and then further failed to bring that error to the attention of the claims department and, in fact, misrepresented the extent of their knowledge, it cannot be said that a jury would not be justified in finding that those agents' actions amounted to willfulness or such gross negligence as to amount to reckless disregard of the Millers' rights.
In Weems v. American Security Ins. Co., 486 So.2d 1222 (Miss. 1986), the Court said:
The absence of an arguable reason, however, does not lead inexorably to an assessment of punitive damages. This is because, as said above, the substantive test for awarding punitive damages is the same in bad faith refusal cases as in any other case where punitive damages are sought. That test requires the plaintiff to show some willful or malicious wrong or the gross or reckless disregard for the rights of others. (Citations omitted).
Weems, 486 So.2d at 1226-27.
Following close upon the heels of Weems, Aetna Cas. & Surety Co. v. Day, 487 So.2d 830, 832 (Miss. 1986), the Court held:
To recover punitive damage from an insurer for amounts over and above policy benefits an insured must prove by a preponderance of the evidence either (1) that the insurer acted with malice, or (2) that the insurer acted with gross negligence or reckless disregard for the rights of others.
From the facts stated hereinbefore, it cannot be contended seriously that MONY had an arguable reason or a legitimate reason or a justifiable reason (all three amount to the same) for denying the Wesson death claim. Finally, after all pleadings were filed, MONY amended its answer and paid into the registry of the court the sum of $87,136.00, the face amount of the policy. The issue of punitive damages was properly submitted to the jury as to whether or not there was a gross or reckless disregard by MONY to the rights of Wesson and others. We reject the argument of MONY that a unilateral mistake on the part of MONY gives it a proper reason for declining to pay the Wesson claim and that it had no actual knowledge as to the APL provision in the Wesson policy. MONY's contention that it is guilty of only simple negligence is overwhelmingly rebutted by the following occurrences:
(1) the intentional coding in accordance with its policies and procedures into its computers of no APL, although requested by Wesson through Wimberly in his policy;
(2) the failure to rectify the coding once it was discovered by MONY in 1976 that endorsement # 64540 did not abrogate the APL provision in such policies as Dr. Wesson's;
(3) this was not an isolated incident, but, rather, involved a large number of policies;
*529 (4) in 1980, the denial of the Wesson claim based on a review of the master message print only, specifically in light of its past action and acquired knowledge with regard to APL in its computer;
(5) the failure of MONY personnel to review the policy when deciding whether to pay a claim; and
(6) the denial of liability in its answer at a time that MONY was on notice as to the APL's existence. Richards v. Allstate Ins. Co., 693 F.2d 502 (5th Cir.1982).
We hold that the question of punitive damages was correctly submitted to the jury, and we reject MONY's first contention.

B.-C.

PLAINTIFF'S DUTY TO DEAL IN GOOD FAITH. IMPROPER INTRODUCTION OF FINANCIAL STATEMENT.[3]
MONY contends that there was error for the trial judge to strike its defense that the attorneys for the Wesson Estate had failed to deal with MONY in good faith and to mitigate damages. Even so, MONY did introduce some evidence with an assertion that there was bad faith on the part of the insured, and the Court instructed the jury, "The law imposes upon both parties to a contract the duty to deal with each other fairly and in good faith... ." Early, appellant made its determination that no APL existed in the Wesson policy and denied the claim long before the letter of July 10, 1980, was sent by Attorney Gunn. This suit brought to light many MONY practices which could have resulted in more wrongful denials of death claims and resulted in subsequent proper payment of at least one wrongfully-denied death claim. There is no merit in this position. Standard Life Ins. Co. of Indiana v. Veal, supra; Bankers' Life & Cas. Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985).
Appellant contends next that the trial judge erred in allowing Wesson to introduce MONY's financial statement during its case in chief prior to any evidence offered by MONY and prior to a resolution by the lower court that a punitive damage issue was made.
It is an elementary principle of law that testimony of the net worth of a defendant is not admissible where the jury is not warranted in awarding punitive damages. Progressive Cas. Ins. Co. v. Keys, 317 So.2d 396, 398 (Miss. 1975), citing Western Union Telegraph Co. v. Cashman, 132 F. 805 (5th Cir.1904); Pullman Palace-Car Co. v. Lawrence, 74 Miss. 782, 22 So. 53 (1897).
In the present case, the issue of actual damages was not before the jury since MONY had paid the face value of the policy into court and a verdict was directed on behalf of the Wessons. The only question for the jury was whether or not punitive damages would be allowed. If there had been no issue, the case would have terminated. That being the only issue, no error was committed. We observe that it is for the trial judge to determine, in a situation such as developed at this point of the trial below, the order in which financial records would be allowed and the conduct of the trial. We are of the opinion that the trial judge did not abuse his discretion, and the argument is rejected.

D.-E.

BURDEN OF PROOF ON ARGUABLE REASON.

JURY CHALLENGES.
Appellant contends that Jury Instruction 014 improperly places the burden of proof on MONY to show that it had an arguable reason for denying the Wesson death claim. The instruction follows:

*530 JURY INSTRUCTION 014
The Court instructs the jury that Defendant MONY has the burden of proving by a preponderance of the evidence, if any, its defense that it had an arguable or legitimate basis for denying the Wesson death claim. In addition, the arguable or legitimate basis asserted by MONY must be the proximate cause of the denial of the claim. In other words, MONY may not deny the claim at the time it was presented for one reason, and, after a lawsuit has been filed, commence an intensive investigation in an effort to find another basis for the denial.
Therefore, if you find from a preponderance of the evidence in this case, that the initial decision to deny the claim on the Wesson policy was not proximately caused by an arguable or legitimate reason, then it is not a defense to MONY that, after denial of the claim and after commencement of this lawsuit it attempted to develop an additional reason for denial of the claim, and any such reason for denial of the claim which was not the basis of the original denial cannot insulate the Defendant, MONY, from an award of punitive damages.
Appellant cites Blue Cross & Blue Shield of Mississippi v. Campbell, 466 So.2d 833 (Miss. 1985), where, on petition for rehearing, the Court wrote: "A plaintiff has a heavy burden to demonstrate to the trial court that there was no reasonably arguable basis for the insurance carrier to deny the claim." 466 So.2d at 844.
Appellee claims that Jury Instruction 004, when read and considered with Instruction 014, correctly states the law and cures any error in 014. That instruction follows:
JURY INSTRUCTION 004
The Court instructs you that if you find from a preponderance of the evidence in this case, if any, that the Defendant, MONY, failed to provide adequate procedures to prevent the denial of the death claim of Ray Wesson and that such failure, if any, was attended by such gross negligence as to indicate reckless disregard of the rights of the children of Dr. Ray Wesson, deceased, and further that MONY lacked an arguable reason for denying the death claim of Ray Wesson, then you may assess punitive damages against the Defendant, MONY.
We are of the opinion that the first part of Instruction 014 improperly stated the burden of proof on MONY to prove by a preponderance of the evidence its defense that MONY had an arguable or legitimate basis for denying the Wesson claim. However, the second paragraph in the instruction correctly places the burden of proof upon the Wessons to prove by a preponderance of the evidence that there was no arguable or legitimate reason for MONY to deny the claim. When it is considered together with Instruction 004, we do not think the instruction constitutes reversible error. This is particularly true, since the evidence is overwhelming that MONY had no arguable, legitimate or justifiable reason to deny the claim and was grossly negligent in doing so.
MONY next asserts that the lower court erred in allowing four (4) peremptory jury challenges to Corporate Planning, Ltd. and Wimberly, and four (4) to the Wesson estate while granting only four (4) peremptory challenges to MONY. The argument is that MONY should have been allowed eight (8) peremptory challenges because Wimberly and Wesson were in concert with each other.
Miss.R.Civ. 47(c) provides:
(c) Challenges. In actions tried before a twelve-person jury, each party may exercise four peremptory challenges; in actions tried before a six-person jury, each party may exercise two peremptory challenges. Parties may challenge any juror for cause. In all claims or actions tried together, two or more parties having relatively similar interests may be aligned as a single party or the court may permit challenges to be exercised separately or jointly.
*531 The trial judge stated: "I have been impressed with the manner in which he has pursued his position in this case. I really have. I'm talking about Mr. Davis [Wimberly's attorney]. I feel like they are separate; that he is separated from the plaintiff."
In Acree v. Collins, 239 Miss. 583, 124 So.2d 118 (1960), the question arose as to the adversity necessary to allow all parties the requisite number of jury challenges. The Court said: "The trial court has a measure of discretion in such matters, and we are in no wise able to say that he erred in this respect." 239 Miss. at 587, 124 So.2d at 120.
We are of the opinion that the lower court did not abuse its discretion on granting peremptory challenges.

F.-G.

DENIAL OF MOTION TO AMEND JUDGMENT ORDER ENTERED AFTER PERFECTION OF APPEAL
MONY contends that the lower court erred in overruling its motion to amend judgment, asserting that the actual damages, to which it offered no objection at the time the peremptory instruction was given thereon, are erroneous. It claims that the $87,136.00 face value of the policy should be reduced as follows:
$6,151.33 for outstanding loans against the policy
406.00 interest on outstanding loans 342.94 for two monthly premiums of Feb. & March, 1980 due to the operation of the APL provision
To this result, MONY claims there should be an addition of $107.49 for post-mortem dividend. Consequently, MONY avers that the actual amount owed by it on the policy is $80,349.16.
No authority is cited by appellant or appellee, other than Miss.R.Civ.P. 59(e) in support of its argument. It is uncontradicted that MONY failed to object to the peremptory instruction and to the return of a judgment for Wesson in the amount of $87,136.00 actual damages. The question of pre-judgment interest was also argued on the motion to amend. There being no specific objection to the instruction when granted, we do not consider the assigned error. Shell Oil Co. v. Murrah, 493 So.2d 1274 (Miss. 1986); Brown v. McCoy, 362 So.2d 186 (Miss. 1978).
MONY contends that the lower court judge's order of June 21, 1984, should be set aside; that it was entered some two months after appeal to this Court had been perfected. On November 5, 1983, the lower court entered an order protecting the confidentiality of certain documents produced by MONY pursuant to discovery. Appeal was perfected to this Court on April 24, 1984, and on the same day, an order was signed by the trial judge declaring that plaintiff's motion to dissolve the motion of confidentiality be taken under advisement and the court retain its jurisdiction and carry the matter over for a decision during either April term of the court or in vacation. Thereafter, on June 21, 1984, the judge made his final ruling.
If the lower court committed error here, it is irrelevant to this appeal and we decline to address the point.

H.

EXCESSIVE AWARD OF PUNITIVE DAMAGES
The Court has held in Section A of this opinion that the question of punitive damages was correctly submitted to the jury. Now, we consider whether the sum of $8,000,000 awarded in punitive damages is excessive and, if so it is, what amount would be proper.
Punitive damage awards have long been recognized and approved in Mississippi jurisprudence, when reasonably applied under the proper facts and standards. Prior to 1977, the usual case for punitive damages was (1) involving gross negligence resulting in personal injuries or (2) some flagrant act by a wrongdoer, which amounted to willful, malicious, or wanton conduct. Beginning with Standard Life Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), $25,000 punitive damage *532 award, and extending through Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985), 1.6 million dollar punitive damage award, there has been an evolution (revolution) in "bad faith" punitive damage awards, now culminating with the present punitive damages assessed in the sum of $8,000,000.
In the recent case of Bankers Life & Casualty Co. v. Crenshaw, supra, the Court set out general factors to be considered in awarding damages:
With regard to punitive damages, our rules are necessarily general. Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to certain general factors which include:
(1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring defendant from similar conduct in the future, Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 248 (Miss. 1977);
(2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L., Inc. v. LaCoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and
(3) The pecuniary ability or financial worth of the defendant, Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942).
483 So.2d at 278.
In addition, the punitive damage award amounts to a measure of compensation to the plaintiff for service to the public in bringing the action, which should act as a deterrent of similar acts of wrongdoing to other members of the public.
The allowance of punitive damages, upon gross negligence, as here, and actual damages, is within the province of the jury upon questions of gross negligence, negligence and contributory negligence. Punitive damages will not be disturbed unless for exceptional causes or the amount is arbitrary or unreasonable. See Yazoo & Miss. Valley Railroad Co. v. Williams, 87 Miss. 344, 39 So. 489 (1905); Hines v. Imperial Naval Stores, 101 Miss. 802, 58 So. 650 (1912); Yazoo & M.V.R. Co. v. May, 104 Miss. 422, 61 So. 449, 450 (1913); Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226, 233 (1962).
We do not pick out one of the factors enumerated in Bankers Life, supra, and additional considerations, and emphasize that factor above the others in the consideration of a punitive damage award. Five states have adopted statutory provisions dealing with punitive damages. For instance, Fla. Stat. Ann. § 768.73(2)(a, b), et seq. (Supp. 1987), compels that forty percent (40%) of a punitive damage award will go to the plaintiff and the remaining sixty percent (60%) of the award to the Public Medical Assistance Trust Fund.
In Ford Motor Co. v. Durrill, 714 S.W.2d 329 (Tex.Civ.App. 1986), which involved the wrongful death claim for a child burned by an exploding gas tank on a Ford Mustang II, the punitive damages returned by the jury amounted to $100,000,000, which was remitted by the trial court to $20,000,000. The Appeals Court then reduced the punitive damages to $10,000,000, stating that the actual damage award was 2.3 million dollars. The Appeals Court further considered the following factors in arriving at the award: (1) nature of the wrong, (2) character of the conduct involved, (3) degree of culpability of wrongdoer, (4) situation and sensibilities of parties concerned, (5) extent to which such conduct offends a public sense of justice and propriety, and (6) the proportion that the punitive damage award bears to the compensatory damage award. The court further iterated that deterrents and punishment are prime objectives in awarding punitive damages, and a strong consideration *533 was the proportion of actual damages to punitive damages.
In Grimshaw v. Ford Motor Co., 174 Cal. Rptr. 348, 119 Cal. App.3d 757 (1981), a horribly burned fire victim of an exploding gas tank on a Ford Pinto was awarded $125,000,000 in punitive damages. The lower court remitted that amount to 3.5 million dollars, which was affirmed by the appellate court.
In Ford Motor Co. v. Durrill, supra, and Grimshaw v. Ford Motor Co., supra, the awards were for terrible personal injuries sustained by the victims, rather than bad faith claims with no personal injuries or actual damages, other than the policy limits, such as are involved here. As stated hereinabove, appellant MONY paid the face amount of the policy, i.e., $87,000 into the court, before trial, when MONY was finally made aware of the gross mistakes and blunders made by it in denying the validity of the claim.[4] The punitive damage award is ninety-two (92) times (in round figures) the admitted amount of the actual damages. The appellees claim no other actual damages, although, of course, their time, attorney's fees and expenses were incurred. The trial below involved only the question of punitive damages.
Again, we have examined the bad faith cases decided by this Court from Standard Life Insurance Co. of Indiana v. Veal, supra, through Bankers Life & Casualty Co. v. Crenshaw, supra, and have analyzed and compared them with reference to the case sub judice. In applying the standards which we have discussed, the Court is of the opinion that the punitive damages awarded in this case are excessive after applying the established standards, and that a remittitur should be entered in accordance with the authority of Mississippi Code Annotated § 11-1-55 (Supp. 1984), as stated in Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d at 278-279. See also Standard Life Insurance Co. of Indiana v. Veal, supra at 249; Jesco, Inc. v. Whitehead, 451 So.2d 706, 714-716 (Miss. 1984) (Robertson, J., concurring).
Therefore, we order a remittitur in the sum of six million five hundred thousand dollars ($6,500,000), on the punitive award of $8,000,000. If the appellee, Wesson, enters such remittitur so as to reduce the punitive damage award to one million five hundred thousand dollars ($1,500,000) within ten (10) days after the judgment of this Court becomes final, then the award as reduced will be affirmed. Otherwise, the cause will be reversed and remanded to the lower court for trial upon the issue of punitive damages alone.

II.
This discussion under Part II relates to the suit of W.A. Wimberly and Corporate Planning, Ltd. and the judgment in their favor against MONY in the sum of three hundred fifty thousand dollars ($350,000).
Wimberly was a knowledgeable and experienced insurance broker. In 1973, he became an agent of MONY under a brokerage agreement. Prior thereto, in 1972, he had formed Corporate Planning, Ltd., which was for the purpose of consulting with and advising prospective insurance customers, and in 1973, he organized Corporate Investments, Ltd., which was for the purpose of selling insurance to be included in plans established and administered by Corporate Planning, Ltd. Wimberly became involved with Caleb Dortch, MONY's agency manager for the Mississippi territory, and MONY's highest ranking authority in Mississippi at that time. Dortch informed Wimberly of operations by other agents, which were being put to use to maximize sales and profits and explained to Wimberly those operations, which were designed to avoid conflict with the Investment Advisers' Act. Dortch testified that he was well acquainted with Wimberly's organizational setup.
On July 20, 1973, Wimberly entered into, on behalf of Corporate Investments, a brokerage and extended commission agreement with MONY. Wimberly was selling large amounts of insurance for MONY, and a broker expense reimbursement plan was offered to, and accepted by, Wimberly, *534 whereby he would be reimbursed for expenses up to the amount of commissions earned. Wimberly testified that MONY's contract was with Corporate Investments, but MONY understood that Corporate Planning and Corporate Investments were one and the same. A memorandum from Dortch to Don Coatsworth, MONY's office manager, dated September 7, 1973, corrobated Wimberly as to the identity of Corporate Planning and Corporate Investments. Further, in May of 1974, Dortch wrote to Wimberly, congratulating him as a result of the sales for MONY and advising him that he qualified for the convention of MONY's top producers. Dortch's letter stated: "The contribution made by Corporate Planning has been invaluable to our agency. All of us certainly appreciate working with you."
On February 1, 1974, Corporate Planning entered into a contract with the Surgical Clinic (Wesson's clinic) to administer its pension and profit-sharing plan. Wimberly had helped Drs. Wesson and Adkins incorporate their medical practice and establish retirement plans for Surgical Clinic. Through Corporate Investments, Wimberly sold to the Surgical Clinic the MONY life insurance policy covering Dr. Wesson, which is the subject of this lawsuit.
Evidence was introduced on the trial by Wimberly and MONY on the question of agency of Wimberly and Corporate Planning. During the trial, Wimberly propounded a request for admissions to MONY, and MONY admitted Corporate Planning and Wimberly were its agents, although two weeks before trial MONY denied agency, explaining that it had only then realized that the brokerage agreement was with Corporate Investments and not Corporate Planning or Wimberly. On December 11, 1980, MONY terminated Wimberly's commission agreement because of low production.[5]
When the Wessons filed suit against MONY and Wimberly and Corporate Planning in August, 1982, Wimberly contacted MONY seeking legal representation to defend the suit against him and Corporate Planning based upon his agency status with MONY. The request for representation was declined by MONY on the advice of counsel that there was a conflict of interest. Wimberly's cross-claim against MONY sought actual and punitive damages from MONY as a result of its wrongful refusal to pay the Wesson death claim, together with damages incurred from providing his own defense. There was a stipulation among the parties that Corporate Planning and Wimberly incurred reasonable attorney's fees in the sum of seventy-three thousand dollars ($73,000). As stated, the jury verdict for Corporate Planning and Wimberly on the cross-claim was $350,000 actual damages. The jury declined to assess punitive damages.

Legal Issues

A.

FAILURE TO GRANT MONY'S MOTION FOR DIRECTED VERDICT, REQUEST FOR PEREMPTORY INSTRUCTION, AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
MONY contends that under the allegations of the complaint and evidence, MONY had no contract with Corporate Planning and Wimberly as agents and that they were not agents of MONY but were agents of the Surgical Clinic; and that MONY owes no indemnity to Corporate Planning and Wimberly for litigation fees. The question of agency was submitted to the jury, which found in favor of Corporate Planning and Wimberly. The applicable principle of law was stated in Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), and has been brought forward numerous times since the decision in Paymaster
The established rule is that when the Court considers whether the defendant is entitled to a judgment as a matter of law, the Court should consider the evidence in the light most favorable to plaintiff, disregard any evidence on the part of defendant in conflict with that favorable to plaintiff, and if the evidence *535 and reasonable inferences to be drawn therefrom would support a verdict for plaintiff, the jury verdict should not be disturbed.
The quotation above, we believe, expresses the better rule for peremptory instruction or a JNOV since it permits the court to examine the evidence of both parties that is not in conflict, as here, in order to reach a legal conclusion; or stated differently, the jury resolves conflicts of fact  the court resolves issues of law arising from non-conflicting facts.
The Restatement (2d) of Agency §§ 438 and 439 (1958), states the principal's duty to indemnify the agent, in pertinent parts, as follows:
§ 438. Duty of Indemnity; the Principle

(1) A principal is under a duty to indemnify the agent in accordance with the terms of the agreement with him.
(2) In the absence of terms to the contrary in the agreement of employment, the principal has a duty to indemnify the agent where the agent
* * * * * *
(b) suffers a loss which, because of their relation, it is fair that the principal should bear.
§ 439. When Duty of Indemnity Exists

Unless otherwise agreed, a principal is subject to a duty to exonerate an agent who is not barred by the illegality of his conduct to indemnify him for:
* * * * * *
(d) expenses of defending actions by third persons brought because of the agent's authorized conduct, such actions being unfounded but not brought in bad faith; and
There is a dearth of authority on this question in Mississippi, but the principle is widely accepted by authorities in other jurisdictions. In Southern Farm Bureau Cas. Ins. Co. v. Gooding, 263 Ark. 435, 565 S.W.2d 421 (1978), the Arkansas Court allowed the agent to be indemnified by the insurer, stating:
Second, it is argued that Southern Farm Bureau's agent, Rodman, should not have been allowed to recover the expenses and attorney's fee he incurred in defending the third-party complaint filed against him by the Goodings. We think the recovery was proper. A principal has a duty to indemnify his agent when the agent suffers a loss which, because of their relation, it is fair that the principal should bear. Restatement, 2d, Agency, § 438 (1958). In particular, the agent can recover the expenses of defending an action brought by a third person because of the agent's authorized conduct. Id., § 439. If Rodman represented to the Goodings that the lowboy would be covered while being pulled by an insured vehicle, that representation was correct. Rodman, the agent, was subjected to the expense of litigation because his principal, Southern Farm Bureau, erroneously denied that the coverage existed. In the circumstances it is fair that the principal be required to indemnify the agent for his expenses, including his attorney's fee.
Gooding, 565 S.W.2d at 423. See also Occcidental Fire & Cas. Co. of North Carolina v. Stevenson, 370 So.2d 1211 (Fla. Dist. Ct. App. 1979), and 3 C.J.S. Agency § 322 (1973).
In Pittman v. Home Indemnity Co., 411 So.2d 87 (Miss. 1982), agency is question for jury.
We are of the opinion that, after thoroughly considering the entire record, the issue of liability for refusal to pay the Wesson claim and for refusal to furnish legal representation to Corporate Planning and Wimberly, were issues of liability properly submitted to the jury.

B.

EXCLUSION OF PROOF OF AGENCY
MONY claims that the lower court committed error in not allowing MONY to introduce documents, which reflected administrative services performed by Corporate Planning and Wimberly for the Surgical Clinic during the period from 1973 to 1980, specifically relating to procuring and servicing of other life insurance policies *536 through the plan. Counsel for Corporate Planning and Wimberly offered to stipulate that they were agents for the Surgical Clinic for administrating the particular plan involved from 1974 through 1980, when they were terminated by MONY. The lower court restricted the evidence to that particular plan.
In the case sub judice, there is no issue as to whether Corporate Planning and Wimberly were agents of Surgical Clinic or MONY. Actually, Corporate Planning and Wimberly held a position of dual agency. The issue before the Court was whether or not Corporate Planning and Wimberly were acting as agents of MONY in relation to their acts regarding the MONY life insurance policy or if they were acting outside the scope of that agency status. MONY cites Luke Constr. Co. v. Jernigan, 252 Miss. 9, 172 So.2d 392 (1965), which held that certificates of insurance were indicative of a course of conduct which was competent evidence on the issue of whether or not Jones was the agent of Luke or was an independent contractor. That question was not before the lower court.
The contention is rejected.

C.

EXCESSIVE AWARD OF ACTUAL DAMAGES; EVIDENTIARY RULINGS ON PROOF OF DAMAGES
MONY argues on this assigned error that the testimony of Dr. Charles Dennis, who qualified as an imminent economist, was total and complete speculation. His expertise in economic loss due to business damage or injury was completely established. He testified as to his method of calculating the future lost profits of Corporate Planning. Although Dr. Dennis' method is not a guaranteed exact measurement, it was probably the best yardstick and rule that could have been presented. Decisions in other jurisdictions upheld the method employed by Dr. Dennis. Sinclair Ref. Co. v. Gutowski, 195 F.2d 637 (6th Cir.1952); Lucky Auto Supply v. Turner, 244 Cal. App.2d 872, 53 Cal. Rptr. 628 (1966); Chung v. Kaonohi Center Co., 62 Haw. 594, 618 P.2d 283 (1980); Leoni v. Bemis Co., 255 N.W.2d 824 (Minn. 1977); El Fredo Pizza, Inc. v. Roto-Flex Oven Co., 199 Neb. 697, 261 N.W.2d 358 (1978); Wilko of Nashua, Inc. v. Tap Realty, Inc., 117 N.H. 843, 379 A.2d 798 (1977); Smith Development Corp. v. Bilow Enterprises, Inc., 112 R.I. 203, 308 A.2d 477 (1973).
In Nichols v. Stacks, 485 So.2d 1034 (Miss. 1986), the Court discussed a similar question of damages:
In Merritt v. Dueitt, 455 So.2d 792, 793 (Miss. 1984), we stated:
The rule that damages, if uncertain, cannot be recovered applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent recovery.
In Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss. 1984), Justice Prather, speaking for this Court, further refined this rule in stating:
... [W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence  with such certainty as the nature of the particular case may permit  lay a foundation which will enable the trier of facts to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss. [Emphasis added].
As noted in Cain, and emphasized in Thomas v. Global Boat Builders & Repairmen, Inc., 482 So.2d 1112 (Miss. 1986), a plaintiff under this rule cannot ignore information, methods and procedures available to him whereby he can *537 accurately prove the amount of monetary damages and make a jury issue simply by testimony that he did suffer property damage. On the other hand, a plaintiff who has unquestionably suffered a pecuniary loss, and has produced the best evidence available to him, should not be denied recovery because the amount cannot be ascertained with the same precision as an ordinary claim for damages. Under these circumstances he is only required to put on sufficient proof to enable the fact finder to reach a fair and reasonable estimate of the damages.
485 So.2d at 1038.
Testimony from Caleb Dortch, MONY's Mississippi executive, indicated that wrongful acts asserted and proved against MONY could damage the reputation of Corporate Planning, its agent. Mr. Matt Ballew, a Corporate Planning stockholder, and Wimberly, testified that their business relies on referrals from professionals such as doctors, lawyers and accountants, and that their reputation is critical to obtain these referrals. Stephen Stewart, a partner at Moore & Powell, C.P.A., on the Mississippi Gulf Coast, testified that he has not in the recent past referred any potential client to Corporate Planning due to the circumstances in which Corporate Planning and MONY were involved. Such testimony was an indication of future profits unrealized by Corporate Planning due to its damaged reputation caused by MONY's wrongful refusal to pay the Wesson death claim.
MONY asserts that Instruction No. 11, which stated in part: "Such damages may include damages from mental anguish or emotional distress that W.A. Wimberly has suffered or is reasonably certain to suffer in the future, as a proximate result of MONY's wrongful conduct, if any you find pursuant to the instructions of the Court," was error. It cites Sears, Roebuck & Co. v. Devers, 405 So.2d 898 (Miss. 1981), wherein the Court held that in the absence of physical injury, damages for mental distress are not appropriate unless the cause was attended by such acts that would ordinarily warrant a punitive damage instruction. Corporate Planning and Wimberly argue that T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481 (Miss. 1972) supports the jury instruction here. The Eshee Court held that the giving of a similar instruction which included the word "negligence" instead of "fraud or wrongful acts" did not require reversal, citing Miss. Sup.Ct. Rule 11.
Without considering mental anguish, the testimony indicated Corporate Planning and Wimberly sustained approximately five hundred thirty-seven thousand seven hundred forty dollars ($537,740) in actual damages, with one hundred seventy-five thousand dollars ($175,000) loss of existing business and attorney's fees uncontradicted. The jury verdict was for $350,000 actual damages, with no award for punitive damages.
This assignment of error is rejected.

D.

USE OF ADKINS' DEPOSITION
MONY asserts that it was prejudicial error for the trial court to admit into evidence the deposition of Dr. Adkins, since it was denied the right to cross-examine him with regard to testimony given at the trial, and since Corporate Planning and Wimberly failed to exercise due diligence in procuring Dr. Adkins' attendance. MONY claims that the effort supplied by Corporate Planning and Wimberly in finding and serving Dr. Adkins is woefully short of the due diligence required to be shown before the trial court is allowed to use a deposition in his stead.
The record reflects that Dr. Adkins' office was located about twenty (20) miles from the courthouse. Only one attempt was made to serve Dr. Adkins, at which time he was in surgery. In response to MONY's objection to the deposition, the lower court allowed the deposition's use as a special circumstance since Dr. Adkins was a surgeon. The Miss.R.Civ.Proc. Rule 32(a)(3)(D) provides:
(a) Use of Depositions. At the trial or upon the hearing of a motion of an interlocutory proceeding, any part or all or a deposition, so far as admissible under the *538 rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
* * * * * *
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (A) that the witness is dead; or (B) that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or (C) that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; or (D) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or (E) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
We have not been cited to a Mississippi decision addressing Rule 32(a)(3)(D). In Rascon v. Hardiman, 803 F.2d 269 (7th Cir.1986), the United States Court of Appeals for the Seventh Circuit held that admission of deposition testimony is within the sound discretion of the trial court. However, that court noted that the trial judge was satisfied due diligence was met. Rascon, supra.
The lower court, in the case sub judice, responding to MONY's argument as to the lack of due diligence by Corporate Planning and Wimberly, stated: "Of course I know ordinarily it wouldn't be, but when you have doctors and surgeons and all, I think we ought to bend the rule and try to use depositions when we can where they are involved." The lower court did not find that Corporate Planning and Wimberly were diligent in attempting to procure the presence of Dr. Adkins. However, the argument and brief of MONY did not inform or indicate to this Court any benefit it would have received from Dr. Adkins's presence, nor does MONY state how it was prejudiced by the use of the deposition. We note that MONY was the party originally initiating the taking of Dr. Adkins' deposition, and that MONY questioned him extensively. Therefore, we are of the opinion that in the absence of prejudice, failure to procure the presence of Dr. Adkins at trial does not constitute reversible error. Miss.Sup.Ct. Rule 11.
AFFIRMED ON CONDITION OF REMITTITUR.
HAWKINS, P.J., and PRATHER and GRIFFIN, JJ., concur.
DAN M. LEE, P.J., and ANDERSON and SULLIVAN, JJ., dissent.
ROBERTSON, J., dissents by separate opinion.
ZUCCARO, J., not participating.
ROBERTSON, Justice, dissenting:
If the matters discussed in the opinion of the Court were all that were involved today, I would assent. For better or for worse, there is more. Indeed, cases of this sort have been taken from our hands altogether.
Pilot Life Insurance Company v. Dedeaux, 481 U.S. ___, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), is the thief. In that case the Supreme Court on April 6, 1987, held that Section 514(a) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, et seq., preempted state common law actions charging an insurer's improper processing of an employee's claim for benefits under an insured employee benefit plan. As the plan under which the present action has been brought lies well within ERISA's coverage, we are bound to stay our hand. See U.S. Const. Art. VI, cl. 2 (1787).
To be sure, Mutual of New York did not plead preemption nor assign its denial as error. The point was not mentioned until Pilot Life was decided and Mutual of New *539 York's counsel wrote us to that effect. No matter. ERISA provides nothing less than that the courts of this state have no authority over cases of this sort. Where a matter is federally preempted, the parties may not by agreement or waiver confer upon us authority to decide it. See International Longshoremen's Association, AFL-CIO v. Davis, 476 U.S. 380, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).
I would reverse and render.
ZUCCARO, J., not participating.
ANDERSON, Justice, dissenting:
This is a classic example of a difficult case creating bad law.
First, I note that I am in agreement with the majority in finding MONY's conduct and practices intentional and detrimental, not only to the plaintiffs here involved but to other policyholders as well and that it warranted an award of punitive damages. But having considered these facts and the applicable law in this case, I cannot agree that the punitive damage award assessed by the jury was so excessive as to require remittitur.
The majority notes that the jury award of $8 million was 92 times the amount of actual damages. Some states have limited the recovery of punitive damages to a specified proportion of actual damages. However, I must point out that this is not the standard employed by this Court and consideration of proportionality rather than net worth is error.
A summary of the general factors to be considered in awarding damages is outlined in Bankers Life and Casualty Co. v. Crenshaw, 483 So.2d 254 (Miss. 1985).
With regard to punitive damages, our rules are necessarily general. Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to certain general factors which include:
(1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring defendant from similar conduct in the future. Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977).
(2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L. Inc. v. LaCoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and
(3) The pecuniary ability or financial worth of the defendant, Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942). 483 So.2d at 278.
In Crenshaw the Court found the insurer provided no arguable defense in its failure to pay on a policy. The Court held that in light of the insurer's conduct and ability to pay, a punitive damage award of $1.6 million was not excessive.
MONY's financial statement for 1982 disclosed total assets in the amount of $8,754,357,835 and net worth in the amount of $447,934,890. The $8,000,000 punitive damage award represented approximately 1.785% of MONY's net worth. The new court-substituted award of $1.5 million equals only .33487% of the appellant's net worth.
The majority is establishing a precedent here with which every other punitive damage case coming before this Court must comply. That precedent or standard, announced herein is that a defendant, however obstinate and reprehensible his conduct, can victimize others and engage in such conduct with full assurance under this case that his monetary punishment will be much less than 1% of his net worth. A party with a net worth of $100,000 can feel free to abuse others with the knowledge that this Court will requirea penalty of no more than $1,000. This is not a message I care to join in sending.
*540 We recognize the fact that this Court has never before affirmed a punitive damage award of this magnitude. That is no basis for disallowing recovery in a proper case. Tetuan v. A.H. Robbins, 738 P.2d 1210, 241 Kan. 441 (1987); ($7.5 million award in punitive damages); Ford Motor Co. v. Durrill, 714 S.W.2d 329 (Tex. App. Corpus Christi 1986); (awarded $10 million in punitive damages); Downey Savings & Loan Assoc. v. Ohio Casualty Ins. Co., 189 Cal. App.3d 1072, 234 Cal. Rptr. 835 (1987), ($5 million award in punitive damages representing 1.9% of the defendant company's net worth).
In previous cases where the award of punitive damages has been considered by this court to be excessive, the practice has been to reverse and remand  not substitute judgment. Snowden v. Osborne, 269 So.2d 858 (Miss. 1972); First American National Bank of Iuka v. Mitchell, 359 So.2d 1376 (Miss. 1978).
Snowden, supra, relied in its decision on Yazoo and Mississippi Valley RR Co. v. Williams, 87 Miss. 344, 39 So. 489 (1905):
... It is the long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might be, interference therewith, unless for exceptional causes, is discouraged ... the reason being that, as the jury are the sole judges of the amount which ought properly to be assessed in order to inflict adequate punishment, the courts should scrupuously avoid any undue intereference with their prerogative... .
(87 Miss. at 355-356, 39 So. at 491).
The Court went on to explain a difference in the rule obtaining in actions for compensatory and punitory damages. In an action for compensatory damages, the jury is confined or restricted to consideration of the facts in evidence which serves as a guide or admeasurement of the damages actually sustained as shown by the proof. The existence of certain elements may be shown in proof to assist the jury in a determination of an amount which will fairly recompense or make the injured whole.
However, in punitive damage cases, the jury does not have as clear a guideline by which to determine the amount necessary to adequately punish the wrongdoer, protect the public and deter such future conduct. Such awards are most properly submitted to the "discretion, sound judgment and combined wisdom of jurors drawn indiscriminately from every walk of life."
Recently, in Mississippi Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 935 (Miss. 1986), this Court affirmed a punitive damages award of $250,000 arising out of a bad faith insurance action. The Court most aptly stated: "Insurance consumers in Mississippi are entitled to protection from such practices, and here that protection was provided at the hands of the jury." Likewise, in the case at bar, the jury had an opportunity to examine the wrongdoing and its harmful effect upon the individual litigant and the public, to consider the financial ability of the wrongdoer and to assess a sum certain to effectuate the goals of punishment, deterance and rewards to those bringing the wrongdoer into account. Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977); Employers Mutual Casualty Co. v. Tompkins, 490 So.2d 897 (Miss. 1986).
I am of the opinion that the jury fully and fairly considered all of the factors necessary in assessing the award. This award, although high, is not disproportionate to the transgression involved in this case and the financial ability of the appellant to pay. This Court is not authorized to disturb a jury verdict regarding the amount of damages because it "seems too high, or seems too low." Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036, 1037 (Miss. 1979).
It is well established that this Court has authority to enter a remittitur both by statute and by caselaw. My contention is that because we can do so does not necessarily mean that we should. It is more properly the function of the jury.
I do not feel it appropriate for this Court to get into the business of regulating punitive *541 damages. More problems are created than resolved as this case today becomes the yardstick by which future punitive damage cases must be measured. For these reasons, I respectfully dissent.
DAN M. LEE, P.J., and SULLIVAN, J., join this dissent.
NOTES
[1] The project did not involve Dr. Wesson's policy since his policy was coded from its inception into the computer indicating no APL provision. Reference to the project indicates MONY's inconsistency regarding its attitude and conduct toward APL provisions.
[2] The 1978 and 1979 premiums were paid by loans against the cash value made by Drs. Wesson and Adkins, who signed service request forms to facilitate premium payments in that manner.
[3] The question of what effect, if any, the Employee Retirement Income Security Act of 1974 (ERISA) [29 U.S.C. §§ 1001, et seq.] as interpreted by Pilot Life Ins. Co. v. Dedeaux, ___ U.S. ___, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), has upon this claim is not addressed, since it was not raised in the lower court or in the appellate briefs and argument. (NOTE that Pilot was decided after this case was submitted).
[4] We are aware that the net assets of MONY are $8 billion.
[5] Dr. Wesson died March 14, 1980.